UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

R. ALEXANDER ACOSTA,
Secretary of Labor, United States
Department of Labor                                                    PLAINTIFF


v.                                                    CIVIL ACTION NO. 3:15-cv-00562-CRS


KDE EQUINE, LLC, d/b/a STEVE
ASMUSSEN STABLES, and
STEVE ASMUSSEN                                                    DEFENDANTS

## <u>MEMORANDUM OPINION</u>

This matter is before the court on cross-motions of the parties for summary judgment. The Plaintiff, R. Alexander Acosta, the Secretary of Labor, U.S. Department of Labor ("DOL"), moves for partial summary judgment (DN 61). The Defendants, KDE Equine, LLC, d/b/a Steve Asmussen Stables ("KDE") and Steve Asmussen ("Asmussen"), move for summary judgment (DN 62). Fully briefed, these matters are ripe for review. For the following reasons, the court will **GRANT IN PART** and **DENY IN PART** the Plaintiff's partial motion for summary judgment. The court will **GRANT IN PART** and **DENY IN PART** the Defendants' motion for summary judgment.

## I.   BACKGROUND

Steve Asmussen is a licensed, professional Thoroughbred racehorse trainer. (DN 62, 5, ¶ 3.) Asmussen and his wife own and co-manage KDE, a Thoroughbred horseracing operation. (*Id*. at ¶ 2.) KDE is a limited liability company with locations in: Lone Star Park, Grand Prairie, Texas; Belmont Park, Elmont, New York; Keeneland Race Course, Lexington, Kentucky; and

Churchill Downs, Louisville, Kentucky.  (*Id*. at ¶ 4.)  According to Asmussen, KDE is one of the largest Thoroughbred racehorse training and care operations in the United States.  (DN 62-1, 11:22-25.)  At one point in 2017, Asmussen and KDE were training approximately 180 Thoroughbred racehorses.  (DN 61-1, 2, ¶ 6.)

During the time relevant to this action, KDE employed between 120 and 150 employees in various positions.  (*Id*. at 3, ¶ 12.)  Among these employees are "hot walkers" and "grooms." (*Id*. at ¶ 13.)  Hot walkers walk, and sometimes bathe, the horses after a training session in order to cool them down.  (*Id*. at ¶¶ 14 -15.)  Grooms get the horses ready for their training session, which includes tasks such as saddling the horses, administering liniments and poultices, brushing the horses, clipping their nails, and cleaning the stalls.  (*Id*. at ¶ 17.)  Additionally, on race days grooms will lead the horses to the track and hot walkers will cool them down after the race.  (*Id*. at 6, ¶ 42.)

Grooms generally start the work day at 5:00 a.m. and work to around 11:00 a.m. seven days per week.  (DN 62-4, 12-13.)  Then, grooms come back to work every afternoon from 3:00 p.m. until around 4:30 p.m.  (DN 61-4, 13:9-12.)  On race days, grooms may work additional hours if they have a horse running.  (DN 61-22, 33:6-24.)  The parties have agreed that grooms generally work 48.5 – 52.5 hours per week.  (DN 61-13, 52; DN 61-1, ¶ 39; DN 67, ¶ 39.)

Hot walkers also work seven days a week, from 5:00 a.m. until around 10:00 a.m. or 10:30 a.m.  (DN 61-4, 9:20-22; DN 61-7, 9:14-16.)  In a seven day work week, some hot walkers may also work additional afternoons every other day. Testimony indicates that these afternoon hours are from around 3:00 p.m. or 3:30 p.m. until around 4:30 p.m.  (DN 61-4, 10:8-10; DN 61-6, 18:5-10; DN 61-7, 9:22-25.)  KDE's hot walkers work approximately 38 – 42.5 hours a week. (DN 61-13, 51 - 52.)

The parties have agreed that the hot walkers and grooms are both paid a salary. ("Like Plaintiff, Defendants do not dispute that the workers were paid a salary.") (DN 70, 4.) It is undisputed that the grooms are paid $1,000.00[1] every two weeks. (DN 61-4, 14:1-3; DN 61-1, ¶ 21; DN 67, ¶ 21.) Hot walkers are also paid on a two week basis. (DN 61-4, 14:6-10.) Payroll records indicate that hot walkers are paid $652.00 per pay period. (*Id.*; DN 62-20.)

Additionally, the parties agree that both the grooms and hot walkers are paid extra compensation if they perform additional tasks beyond their normal working duties. (DN 61-1, 4, ¶ 22.) For example, an employee who walks a horse to a race is paid a flat fee of $25.00. (*Id.* at ¶ 23.) Unloading hay also earns the employee $25.00. (*Id.*) If the employee does the laundry she earns $100.00. (*Id.*) These additional forms of compensation are "fixed sums" and not considered part of the employees' salaries. (DN 61-7, 13.) The Defendants, through the testimony of KDE accountant Pete Belanto, testified that these fixed sums would always compensate the employees at a rate of at least time and a half. (DN 61-8, 54:12-23.) However, there is no dispute that employees did not record the actual hours they worked for each task on their time sheets. (DN 62-6, 29-30.)

The DOL filed an Amended Complaint in this court in January of 2017 for violations of the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. § 201 *et seq*. Specifically, the DOL brings claims against KDE and Asmussen under 29 U.S.C. § 206 ("Section 6") for failing to pay employees the federal minimum wage, 29 U.S.C. § 207 ("Section 7") for failing to pay employees overtime wages, and 29 U.S.C. § 211 ("Section 11") for failing to keep adequate and accurate employment records. The DOL moves for partial summary judgment on its Section 7

---

[1] While the parties have agreed that the grooms are paid a fixed salary of $1,012.00, the Defendants' briefing on the present motions refers to the grooms' salaries as $1,000.00. Despite the inconsistency, this $12.00 differential does not materially change the court's analysis. The Court, consistent with the parties' briefing, will assume the grooms are paid a fixed salary of $1,000.00 every two weeks.

and Section 11 claims.  Additionally, the DOL has moved for liquidated damages and the application of a three-year limitations period.  The Defendants have moved for summary judgment on each count in the Amended Complaint.

## II.    STANDARD

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Additionally, the Court must draw all factual inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991)).

## III.    DISCUSSION

This action is brought under provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.  The Plaintiff alleges that the Defendants violated the FLSA's minimum wage provision (Section 6), maximum hours provision (Section 7), and the provision requiring the maintenance of adequate employee records (Section 11).  Under the Act, non-exempt employees are guaranteed a minimum hourly wage of $7.25.  29 U.S.C. § 206.  For any work performed in

excess of forty hours they are entitled to hourly pay at a rate of one and one-half their regular hourly rate. 29 U.S.C. § 207(a)(1).

There is no dispute that KDE is an employer subject to the provisions of the FLSA. (DN 59, 2.) Further, the parties have stipulated that that the hot walkers and grooms are non-exempt employees that are required to be paid overtime compensation in addition to a minimum wage. (DN 64, ¶ 2.) Rather, the dispute resides in whether the salaries of the hot walkers and grooms, along with the additional flat-rate compensation paid to employees for specified tasks, complies with the minimum requirements for minimum wage and overtime pay for non-exempt employees under the FLSA. Additionally, the parties dispute the adequacy of KDE's record keeping, the applicable statute of limitations to this action, and the availability of liquidated damages. The court will address each claim in turn.

## A. Section 11

The Court first will address Section 11 of the FLSA, as the state of the Defendants' employment records is instrumental in determining the outcome of the remaining claims.[2]

Section 11 of the FLSA states as follows:

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

29 U.S.C. § 211(c).[3] Under this provision, an employer is required "to make and keep records of employees' wages and hours, plus other employment conditions and practices." *U.S. Dept.' of*

---

[2] A finding that the record-keeping requirements of Section 11 were violated reduces the DOL's burden of proof on the remaining claims. Once the Plaintiff provides evidence that the employment records are inaccurate or inadequate, "[t]he burden then shifts to the employer to come forward with the evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [plaintiff's] evidence." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).

*Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 779 (6th Cir. 1995). The regulations additionally require an employer to "maintain and preserve" employment records indicating, among other information, "[h]ours worked each workday and total hours worked each workweek." 29 C.F.R. § 516.2(a)(7). Employers are expected to keep payroll records for a period of three years and time sheets for a period of two years. *Cole Enterprises*, 62 F.3d at 779; *see also* 29 C.F.R. §§ 516.5(a), 516.6(a)(1).

The DOL argues that KDE's employment records are neither adequate nor accurate. The burden to keep accurate wage and time records lies with the employer: "[d]ue regard must be given to the fact that it is the employer who has the duty under [Section 11] of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

A review of the employment records produced by the Defendants shows that KDE has produced payroll records for the calendar years of 2012, 2013, and 2014. (DN 61-14, 9 – 71.) They have also produced copies of check stubs for the year of 2015. (DN 61-15 – DN 61-20.) Lastly, KDE has produced time sheets for pay periods in 2014 and 2015 and a handful of undated, handwritten "time notes," kept by barn foremen, allegedly recording the grooms' and hot walkers' work and overtime hours. (DN 61-21; DN 61-9; DN 61-10; DN 61-9, 5-7.)

First, the DOL argues that none of the records produced by KDE indicate the amount of hours that employees worked in 2012 and 2013. As indicated above, the only records produced for the years of 2012 and 2013 were payroll records, as time sheets and paystubs were not produced for these years. (DN 61-14, 9-36.) A closer review of these pay records confirms that

---

[3] "Authority to enforce the Act's recordkeeping provisions is vested exclusively in the Secretary of Labor." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2002) (citing 29 U.S.C. § 217). Because this action is brought by the Secretary of Labor, this claim is properly before the court.

the 2012 and 2013 payroll records do not indicate the number of hours worked by each employee. (*Id.*) The payroll records for these years list a gross amount earned, but do not indicate how the gross amounts were calculated in terms of hours or overtime hours. (*Id.*) The payroll records produced for the pay periods in 2014, by contrast, list each employee's total hours. (DN 61-14, 36-71.)

Next, the Plaintiff contends that the available records from 2014 reveal inaccuracies in the employees' hours. By way of example, the DOL directs the court's attention to the time sheet and corresponding payroll record of a particular employee for the pay period ending on April 25, 2014. The payroll record of this employee, Carlos Hernandez ("Hernandez"), indicates that he worked 81 hours for the two-week period ending on April 25 and earned a gross salary of $652.00, the typical salary for a hot walker who works the minimum guaranteed hours. (DN 61-14, 38.) However, Hernandez's time sheet for this pay period reflects different hours. His time sheet shows that between April 12 and April 25, he worked every day from 5:00 a.m. until 11:00 a.m., and then again every afternoon from 3:30 p.m. until 5:00 p.m. for a total of 105 hours. (DN 61-21, 6.) A comparison of other employees' payroll records and time sheets from this same pay period reveals additional inconsistencies.[4]

Lastly, the DOL argues that the record-keeping practices of KDE are inadequate because KDE does not accurately record the hours that employees spend on the additional tasks, such as laundry, that earn the employees flat-rate fees in addition to their salaries. Despite disagreeing as the whether or not the hours spent working on these additional tasks "would always be less" than

---

[4] For example, the payroll record of Francisco Argote Martinez indicates that he worked 97.5 hours and earned a gross salary of $850.00. (61-14, 38.) His corresponding timesheet shows he worked 105 hours. (DN 61-21, 3.) The payroll record of Gloria Ambeliz indicates that she worked 81 hours and earned a gross salary of $652.00. (DN 61-14, 38.) Likewise, her timesheet shows she also worked 105 hours. (DN 61-21, 1.)

the hours for which they were paid, there is no dispute that the actual hours spent on each task were not recorded on the employees' time sheets. (DN 61-8, 54:12-23.)

The Defendants do not argue that their record-keeping practices are compliant with Section 11 under 29 C.F.R. § 516.2(a)(7), which requires employers to keep records of "[h]ours worked each workday and total hours worked each workweek." Rather, they respond to the DOL's motion, and simultaneously move for summary judgment, by contending that their record-keeping practices are compliant with Section 11 under an alternative regulation, 29 C.F.R. § 516.2(c). This regulation applies to employees working "fixed schedules" and states that:

> With respect to employees working on fixed schedules, an employer may maintain records showing instead of the hours worked each day and each workweek as required by paragraph (a)(7) of this section, the schedule of daily and weekly hours the employee normally works. Also,
>
> (1) In weeks in which an employee adheres to this schedule, indicates by check mark, statement or other method that such hours were in fact actually worked by him, and
>
> (2) In weeks in which more or less than the scheduled hours are worked, shows that exact number of hours worked each day and each week.

29 C.F.R. § 516.2(c). This regulation is an exception to the normal record-keeping obligations under Section 11 and requires less stringent documentation. However, even assuming that the grooms and hot walkers work "fixed schedules" such that the Defendants are entitled to the less onerous standard of record-keeping, the undisputed facts indicate that KDE violated Section 11 of the FLSA under 29 C.F.R. § 516.2(c) for the years of 2012 and 2013. Whether KDE satisfied the requirements of 29 C.F.R. § 516.2(c) in 2014 is a genuine issue of material fact.

For the calendar years of 2012 and 2013, the only available records of employee hours and wages are the payroll records indicating each employee's gross and net salary for the pay period. A Court has found a similar form of record-keeping to be insufficient. *Berrios v.*

*Nicholas Zito Racing Stable, Inc.*, 849 F. Supp.2d 371, 381 - 82 (E.D.N.Y. 2012) (finding a Section 11 violation when "[t]he Defendants' payroll records merely indicate[d] the employee's name and the amount paid to that individual each week.")

Further, the Defendants have not provided any additional 2012 or 2013 employment records which indicate by checkmark, statement, or other method, that each employee adhered to his or her fixed schedule, if the employee did indeed work a fixed schedule. Courts have found that 29 C.F.R. § 516.2(c)(1) requires an affirmative act: "the text requires verification through some affirmative act that the scheduled hours were in fact worked, or if there is actual deviation on the schedule, requires a listing of all hours actually worked." *Nobles v. State Farm Mut. Auto Ins. Co.*, 2011 WL 3924920 at *4 (W.D. Mo. Sep. 7, 2011.) For the years of 2012 and 2013, KDE has not provided any documentation reflecting an affirmative act.

KDE has submitted the statements of eight individuals, with names redacted, employed as hot walkers or grooms to support its contention that its employment records are accurate. One such statement reads: "Yes, the hours are accurate with what we work and what they pay." (DN 67-6, 1.) Another states, "This is all exact and paid with what I work." (DN 67-6, 3.) While all eight of the statements indicate the employees' beliefs that their salaries accurately reflect the number of hours they work, the statements are otherwise generally vague and the dates of employment for each employee has been redacted. These after-the-fact, generalized statements from eight employees cannot take the place of "a check mark, statement or other method" verifying that for each workweek in 2012 and 2013, the employee was accurately paid for the hours he or she worked.

Additionally, the Defendants state that "the foremen also independently maintain time records of employees, including keeping track of the overtime hours worked by each employee."

(DN 62, 15.)  The Defendants have cited to portions of testimony indicating that barn foremen independently recorded employee overtime hours and sent them to KDE's accountant Pete Belanto.  (DN 62-10, 25.)  KDE has also produced a couple of these time notes.  (DN 61-9, 5-7.) The notes are undated and simply state the number of days worked by each employee in the pay period (such as "2 weeks"), as well as additional sums earned (such as "+25.00"), presumably in relation to the extra tasks that employees may undertake throughout the week.  (*Id*.)  The Court finds that this handful of general and undated notes cannot take the place of an affirmative act verifying that an employee worked a fixed number of hours.

The court recognizes that in 2014, KDE began listing the hours worked by employees on its payroll records.  Additionally, KDE provided the 2014 timesheets of employees.  Despite evidencing more detailed record-keeping in 2014, these documents reveal inconsistencies in the hours recorded on payroll records and on the corresponding timesheets.  The Defendants do not dispute the existence of inconsistencies, but rather insist that "[w]ith the exception of a few aberrational entries… the hours [are] correct."  (DN 67, 21.)  A review of the employment records produced for the pay period ending on April 25, 2014 confirms the existence of multiple inconsistencies.  However, a handful of mistakes or aberrations, alone, cannot amount to a Section 11 violation.  The pertinent question is how many inconsistences exist and the extent of the errors.  Neither party has produced such evidence and it is not the court's responsibility to comb the record to make this determination.  Therefore, whether the 2014 employment records are so inconsistent as to violate the FLSA's record-keeping statute is a genuine issue of material fact.

In summation, the Court finds that between the years of 2012 and 2013, there are no records of the employees' hours or of affirmative acts confirming that the employees' hours did

not deviate from a fixed schedule. The court also finds that in the year of 2014, more detailed employment records were produced, but whether the records are so inconsistent as to violate Section 11 is a genuine issue of fact. Lastly, there are no records indicating the number of hours employees spent on additional employment tasks subject to flat rates, such as laundry.

For the reasons stated, the Plaintiff's motion for partial summary judgment will be granted as to the DOL's claim that KDE violated the record-keeping provisions of Section 11 for the years of 2012 and 2013, and for the additional tasks that earned lump sum payments. The Plaintiff's motion for partial summary judgment will be denied as to the Section 11 claim for the year of 2014. The Defendants' motion for summary judgment as to the Section 11 claim will be denied.

## B. Sections 6 and 7

Section 6 of the FLSA requires an employer to pay its non-exempt employees a wage of at least $7.25 an hour for non-overtime work. 29 U.S.C. § 206. Additionally, Section 7 of the FLSA imposes requirements for wages earned in excess of forty hours a week. Section 7 states, in relevant part,

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The legislative intent of Section 7 is to "spread employment throughout the workforce by putting financial pressure on the employer, and to compensate employees for the burden of overtime workweeks." *Brennan v. Elmer's Disposal Serv., Inc.*, 510 F.2d 84, 87 (9th Cir. 1975) (citing *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948)).

Minimum wage and overtime provisions may be satisfied through various pay practices. *See Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) (finding that "[a]s long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish this regular rate at any point and in any manner they see fit."). At issue is whether KDE's payment practices for hot walkers and grooms satisfy Sections 6 and 7 under either of two salary plans: a salary plan that includes a premium for regularly worked over-time hours, or a "Fluctuating Work Week" salary plan. Also at issue is whether the "lump-sum" payments for additional tasks comply with Sections 6 and 7 of the FLSA.

### 1. "Regularly Worked Overtime" Salary Plan under 29 C.F.R. § 778.309

The Defendants argue that the hot walkers and grooms are paid a fixed, weekly salary "that includes both payment of their full workweek and an overtime premium for the number of regularly worked overtime hours." KDE contends that this payment plan complies with 29 C.F.R. § 778.309, which states as follows:

> Where an employee works a regular fixed number of hours in excess of the statutory maximum each workweek, it is, of course, proper to pay him, in addition to his compensation for nonovertime hours, a fixed sum in any such week for his overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked.

The parties agree that the grooms are guaranteed a salary of $1,000.00 every two weeks. According to the Defendants, this guaranteed salary is in compliance with the DOL regulations as follows: first, they argue that the $1,000.00 salary includes an overtime premium for regularly-performed overtime hours; they state that this salary is the result of paying $8.00 an hour for a guaranteed minimum of 40 regular work hours a week and paying $12.00 an hour for a guaranteed minimum of 15 overtime hours a week; therefore, every two weeks, grooms receive

a paycheck reflecting 80 hours for two workweeks and 30 hours of overtime. In summation, the grooms' paychecks are calculated as follows:

| | | |
|---|---|---|
| (80 hours x $8.00) | = | $640.00 |
| (30 hours x $12.00) | = | $360.00 |
| | | $1,000.00 |

The Defendants contend that the salaries of the hot walkers are calculated in the same method as the grooms. KDE argues that the hot walkers are paid a salary of $652.00 per pay period with a guaranteed a minimum of 40 hours per week and 30 minutes of overtime work a week. This amounts to 80 hours of work and one hour of overtime work every pay period. With an hourly rate of $8.00 an hour, the hot walkers' paychecks are allegedly calculated as follows:

| | | |
|---|---|---|
| (80 hours x $8.00) | = | $640.00 |
| (1 hour x $12.00) | = | $12.00 |
| | | $652.00 |

This calculation, in and of itself, could satisfy the minimum wage and overtime requirements of the FLSA because it pays more than the federal minimum wage and it pays time and a half for hours worked over a forty hour workweek. The inquiry, however, does not end here. The question is not whether the salary plan could pass FLSA muster after the fact, but rather, whether the salary plan was intended to include an overtime premium at the formation of the employment relationship. "When employees regularly work more than forty hours a week and receive a standard wage each week the question arises whether the weekly payment *genuinely* represents payment at a regular rate for the first forty hours plus time and a half for the excess hours." *Nunn's Battery & Electric Co. v. Goldberg*, 298 F.2d 516, 519 (5th Cir.1962) (emphasis added). The fact that an employee regularly works overtime, without more, is not evidence that the salary was intended to include an overtime premium. *See Giles v. City of N.Y.*, 41 F.Supp.2d 308, 316 (S.D.N.Y. 1999).

- 13 -

In order to be subject to 29 C.F.R. § 778.309, an employee must work "a regular fixed number of hours in excess of the statutory maximum each workweek." *Id*. Additionally, the employees must have agreed to be subject to such a salary plan. *See Giles*, 41 F.Supp.2d at 317 (finding that when an employer asserts that an employee's weekly salary includes overtime premiums, the employer must prove "that the employer and employee contracted for the weekly salary to include the overtime period."). The parties dispute whether the grooms and hot walkers satisfy these requirements.

a.   Whether the Employees worked a Fixed Number of Hours

The Plaintiff argues that the grooms and hot walkers work irregular hours "depending on the needs of the operation." (DN 68, 13.) The DOL points to the fact that hot walkers typically work between 38 and 42.5 hours per week, while the grooms generally work between 48.5 and 52.5 hours per week. (DN 61-13, 51 - 52.) The DOL further argues that an employee might work from 5:00 a.m. until exactly 10:00 a.m., but that on other days, the same employee could leave 15 minutes early or stay 15 minutes late. (DN 61-22, 31.)

The Defendants, on the other hand, contend that the schedules of the relevant employees are fixed, including regularly-worked overtime hours, because the employees work "fairly predictable hours at the mercy of the racetrack." (DN 70, 9; DN 61-8, 20:4-7.) Additionally, the Defendants have provided the statements of eight employees, some of who indicated that they work the same hours each week. One employee expressly stated that "We work regular hours." (DN 67-6, 5.)

Ultimately, the employment records provided by KDE in this case are unclear or conflicting as to the number of hours worked by hot walkers and grooms each week. The testimony offered on this issue does not provide clarity. The competing testimony concerning

the employees' hours, in conjunction with the question of the adequacy of KDE's employment records, leads this court to conclude that whether the hot walkers and grooms worked a fixed number of hours is a genuine issue of material fact.

b. Whether the Employees agreed to the Salary Plan

The parties also dispute whether the hot walkers and grooms agreed to a salary plan which included an overtime premium. To determine whether the salary plan actually included overtime premiums in compliance with the regulations, courts look to the intent of the parties at the formation of the employment contract. Courts have found that, when a payment method in the form of a fixed salary incorporating overtime premiums is used, "[u]nless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours." *Berrios v. Nicholas Zito Racing Stable, Inc*. 849 F. Supp.2d 372, 385 (E.D.N.Y. 2012) (citing *Giles*, 41 F. Supp.2d at 317).

When determining whether an employee understood the terms of employment, including a fixed salary plan with an overtime premium, the fact that there is no employment contract is not dispositive. *Berrios*, 849 F.Supp.2d at 385. In the present case, no written employment contract exists to evidence the intent of KDE and its grooms and hot walkers. The Defendants have submitted employee statements, some of which indicate that the grooms and hot walkers know they are paid $8.00 an hour for forty hours a week and $12.00 an hour for overtime work. (DN 67-6.) Another employee stated that "They pay me every two weeks, like a fixed salary." (*Id.*) The testimony of trainers and foremen, such as Assistant Trainers Scott Blasi and Darren Fleming, corroborate this allegation. (DN 62-10, 19:1-10; DN 62-3, 36.). Such evidence tends

to confirm that the employees understood their employment arrangement as a fixed salary, and that they understood that they were paid a premium for overtime hours.

Yet, in a similar case, the court found it significant that "nowhere in the actual record is there any evidence of what the 'agreed upon' weekly hours would be." *Id.* at 387. The record in this case is similarly silent in this regard. The evidence before the court does not provide clarity on whether the employees agreed to work, or actually did work, a certain number of fixed hours, that is, 55 hours a week for grooms and 40.5 hours a week for hot walkers. Therefore, the court declines to make the factual ruling of whether the hot walkers and grooms understood their salaries to include premiums for regularly worked overtime.

c. Conclusion of "Regularly Worked Overtime" Salary Plan

The court finds that there exist issues of fact as to the number of hours the employees worked in excess of the statutory maximum each week. Further, while the court finds that the employees agreed to a fixed salary including an overtime premium, issues of fact exist as to whether the employees agreed to work a certain number of fixed hours weekly. Each party has provided evidence that, when viewed in the light most favorable to the non-moving party, creates a genuine issue as to whether the relevant employees were paid under a "regularly worked overtime" salary plan. Therefore, whether the Defendants complied with Sections 6 and 7 through a "regularly worked overtime" salary plan under 29 C.F.R. § 778.309 is a question appropriate for the jury.

2. *"Fluctuating Work Week" Salary Plan*

Another acceptable salary plan under Sections 6 and 7 of the FLSA is the "Fluctuating Work Week" ("FWW") plan. The Defendants argue, in the alternative, that their employees

were sufficiently compensated under a FWW salary plan. This method of payment has been codified, in part, as follows:

> Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114(c). Thus, under this plan, an employee's hourly rate will vary from week to week according to how many hours she works, and the minimum overtime premium to be paid for hours worked in excess of forty each week is calculated as:

$$\text{Overtime premium} = \frac{1}{2} \text{ x } \frac{\text{salary}}{\text{40 hours}} \text{ x overtime hours}$$

*See Hall v. Plastipak Holdings, Inc*., 2018 WL 1100329 at \*2, (6th Cir. Feb. 28, 2018).

In order to comply with the FWW plan under 29 C.F.R. § 778.114(c), four elements must be satisfied:

(1) the employee's hours must fluctuate from week to week;
(2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums);
(3) the fixed amount must be sufficient to provide compensation every week at a regular rate that is at least equal to the minimum wage; and
(4) the employer and employee must share a "clear mutual understanding" that the employer will pay that fixed salary regardless of the number of hours worked.

*Mitchell v. Abercrombie & Fitch, Co.*, 428 F.Supp.2d 725, 734 (S.D. Ohio 2006). *See also Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 647 (6th Cir. 1986).

There is no dispute as to the second element of the FWW plan because the parties agree that the hot walkers and grooms are subject to a fixed salary. However, the Court has already concluded that the first element under a FWW plan, that is, whether the relevant employees worked fixed or fluctuating hours, is in dispute. Further, the Court finds the testimony on whether KDE and its employees had a "clear mutual understanding" that the employees would be subjected to a salary plan under a FWW plan to be conflicting and unclear. As previously stated, the record does not indicate exactly what the parties agreed to in terms of salary structure. Therefore, the court likewise finds an issue of fact as to whether there existed a "clear mutual understanding" that KDE would pay employees a fixed salary regardless of the number of hours they worked under a FWW salary plan.

Because genuine issues of material fact exist as to the required elements under 29 C.F.R. § 778.114(c), the question of whether hot walkers and grooms were subject to a FWW plan is a question for the jury.

### 3. Lump-Sum Payments

The court is also tasked with determining whether KDE's practice in paying lump sums for extra work duties complies with Sections 6 and 7 of the FLSA. The parties agree that hot walkers and employees earn lump-sum payments for additional work beyond their weekly job duties. As previously stated, an employee could earn $25.00 for walking a horse to a race, $25.00 for unloading hay, or $100.00 for doing laundry. The DOL's Field Operations Handbook ("FOH") provides guidance on such payment structures:

> Under appropriate circumstances, and where close scrutiny reveals there is a clear understanding between the employer and the employee that a lump-sum payment

is predicated on at least time and one-half the established rate, and that overtime payment is clearly intended, the fact that the payment is a lump sum will not result in a violation if it equals or exceeds the proper overtime payment due… This policy shall be applied very narrowly and shall not be applied to lump-sum payments which are nothing more than bonuses for working undesirable hours.

DOL Field Operations Handbook § 32j06. While the FOH is not binding authority, "it is persuasive evidence of the DOL's intent and should be considered." *Harrison v. Rockne's Inc.*, 274 F. Supp. 3d 706, 713 (N.D. Ohio 2017); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that the Secretary's interpretation of his own regulation is "controlling unless plainly erroneous or inconsistent with the regulation.") (citation omitted).

Under the guidance of the FOH, lump sum payments for extra job duties are not per se violations of the FLSA. However, the FOH is clear that, not only must there be an understanding between the employer and employee regarding the payment arrangement of lump sums, but the flat fee must equal or exceed the proper overtime payment due.

The Defendants have provided testimony that the tasks were always completed in less time than for what they were compensated. (DN 61-8, 54:12-23.) However, it is also undisputed that employees did not record the hours they spent on these tasks. (DN 62-6, 29-30.) The barn foremen's "time sheets" only indicate the task that was performed or the lump sum that was earned by an employee during a pay period ("+ blacksmith" or "+ $25.00). (DN 61-9, 5-7.) Even assuming there was a "clear understanding" regarding the payment of lump sums for specified tasks, there is a genuine issue of fact as to whether the employees actually were compensated for at least time and a half for additional tasks. Therefore, whether the employees were adequately compensated through these lump-sum payments is an issue for the jury.

### 4. Conclusion of Sections 6 and 7 Violations

The court has found that material issues of fact exist as to whether hot walkers and grooms were paid in compliance with the FLSA according to a salary plan that included overtime premiums, or according to a fluctuating work week salary plan. There is also a material dispute of fact as to whether the employees were properly compensated for additional tasks that earned lump-sum wages. Therefore, the DOL's partial motion for summary judgment as to its Section 7 claim will be denied. Likewise, the Defendants' motion for summary judgment as to the Section 6 and 7 claims will be denied.

## C. Statute of Limitations

The original enactment of the FLSA in 1938 did not provide for a statute of limitations. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 131 (1988). In 1947, Congress enacted a two-year statute of limitations period for claims under the FLSA, and in 1966, adopted a three-year limitations period for willful violations of the Act. *Id*. at 131 – 132. Thus, as the Act stands, claims under the FLSA are subject to a two-year statute of limitations unless the plaintiff can establish that the defendant willfully violated its provisions.

The Supreme Court has held that in terms of FLSA claims, the standard for a willful violation is that "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id*. at 133. *See also Elwell v. University Hospitals Home Care Services*, 276 F.3d 832, 841 n. 5 (6th Cir. 2002) (finding that "mere negligence by the employer is not sufficient to permit a finding of willfulness."). Whether a defendant willfully violated the FLSA is factual question. *See Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991) (reviewing the record to determine whether a genuine issue of material fact existed as to the willfulness of the defendants' acts.).

In 2013, an injunction was issued in the Eastern District of New York that permanently enjoined Asmussen and KDE from violating provisions of the FLSA, including Sections 6, 7, and 11. (DN 62-5.) The Plaintiff urges the court to find the alleged actions of the Defendants in this case "willful" based upon the 2013 injunction. Inasmuch, the DOL argues that Asmussen and KDE were on notice that they were in violation of the FLSA in 2013 and continued to violate the Act, thus creating an inference that any recent violations by KDE were willful.

Since 2013, the record shows KDE has changed some of its employment practices. For example, KDE began implementing time sheets for its hot walkers and grooms. (DN 62-6, 37.) Additionally, the Defendants state that labor law signs were posted in KDE barns. (DN 67-6, 2.) The Defendants point to these actions to show that any recent violations of the FLSA were not willful.

Even taking the facts in the light most favorable to the Plaintiff, the record does not indicate that the Defendants' alleged violations were willful. KDE has taken affirmative steps to change employment practices and record-keeping to comply with the 2013 injunction. Even if these affirmative actions are not sufficient under certain provisions of the FLSA, such insufficiencies would amount to, at most, mere negligence. The court finds that any FLSA violations by KDE were not willful. As such, the limitations period of this action is two years.

### D. Liquidated Damages

"Closely related to the question of willfulness on the part of the defendants is the issue of liquidated damages." *Dole*, 942 F.2d at 967. The FLSA provides for liquidated damages in the amount equal to actual damages. 29 U.S.C. § 216(c). An award of liquidated damages may be reduced or eliminated at the trial court's discretion "if the employer shows to the satisfaction of the court that the act or omission giving rise to the action was in good faith and that he had

reasonable grounds for believing that his act or omission was not in violation of the [FLSA]." *Id*. at § 260.

The employer bears the burden of showing that its violations of the FLSA were nevertheless acts or omissions in good faith. *See Dole*, 942 F.2d at 968 (finding that the employer "has the substantial burden of proving to the satisfaction of the trial court that its acts giving rise to the suit are *both* in good faith *and* reasonable.") (citations omitted) (emphasis in original).

As with the question of whether a defendant acted willfully, the question of whether a defendant acted in good faith is a factual issue. *See id.* On the issue of liquidated damages, the parties presented similar evidence as that cited to in their briefing on the issue of willfulness. Likewise, the court finds that the Defendants acted reasonably and in good faith by taking affirmative steps to change its employment and record-keeping practices based on the 2013 injunction. The Plaintiff's partial motion for summary judgment on liquidated damages will be denied and the Defendants' motion for summary judgment on liquidated damages will be granted.

## IV. CONCLUSION

For the reasons stated, the court will:

(1) **GRANT IN PART** and **DENY IN PART** the Plaintiff's partial motion for summary judgment to the following extent:

    a. the court will **GRANT** the Plaintiff's partial motion for summary judgment as to the Section 11 claims for the 2012 records, 2013 records, and the records of employment tasks earning lump sums;

    b.  the court will **DENY** the Plaintiff's partial motion for summary judgment as to the Section 11 claims for the 2014 records; and

    c.  The court will **DENY** the Plaintiff's partial motion for summary judgment as to the Section 7 claim, claim for "willful" violations, and claim for liquidated damages.

(2) **GRANT IN PART** and **DENY IN PART** the Defendants' motion for summary judgment to the following extent:

    a.  the court will **DENY** the Defendants' motion for summary judgement as to the claims under Sections 6, 7, and 11 of the FLSA;

    b.  the court will **GRANT** the Defendants' motion for summary judgment as to the claim for "willful" violations; and

    c.  the court will **GRANT** the Defendants' motion for summary judgment as to the claim for liquidated damages.

An order will be entered in accordance with this opinion.

March 29, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**