UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| EUGENE SCALIA, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>KDE EQUINE, LLC, d/b/a/ STEVE ASMUSSEN STABLES and STEVE ASMUSSEN,<br><br>Defendants. | Civil Action No. 3:15-CV-562-CHB<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

*** *** *** ***

This matter is before the Court for disposition after a bench trial. Plaintiff (the Secretary of Labor) seeks an award of back wages under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") for more than 100 employees[1] who worked for Defendants KDE Equine, LLC d/b/a Steve Asmussen Stables ("KDE") (a horse training business) and Steve Asmussen (the principal of KDE and a professional thoroughbred horse trainer). [*See* R. 129-4 at 28:1-4] Plaintiff seeks these back wages for the period that Defendants produced payroll records covering (June 25, 2013 to December 2015) as well as the period thereafter, for which Defendants did not produce payroll records (from January 1, 2016 to the present). [R. 128 at pp. 13, 14] Plaintiff also seeks an injunction restraining future violations of the FLSA. The Court now issues its findings of fact and conclusions of law in accordance with Federal Rule of Civil

[1] These employees were identified on Exhibit B to the amended complaint. [*See* R. 43-2.]

Procedure 52(a)(1) and (c).

By way of background, Steve Asmussen is a successful thoroughbred horse trainer. He and his business (KDE) train thoroughbred racehorses across the United States. As it turns out, however, Asmussen is a much better horse trainer than he is an employment record keeper, given his long history with the Department of Labor. In 2013, after an investigation by the DOL into Asmussen's horse training business in New York, Defendants entered into a Consent Judgment with the DOL in which they agreed to pay back wages and further agreed to entry of an injunction requiring their future compliance with the FLSA. That injunction was entered on January 24, 2013, by the United States District Court for the Eastern District of New York. Just two and a half years after entry of that injunction, the DOL filed suit in this case, alleging that Defendants continue to flout FLSA laws. This time, the FLSA violations are related to their training operations in Kentucky. As explained in detail below, the Court generally agrees with the DOL (except as to the allegations of minimum wage violations).

The Court concludes that the Plaintiff has proven his claims for violations of the overtime and recordkeeping provisions of the FLSA. However, the Court finds that Defendants are entitled to judgment on the Plaintiff's claim for violations of the FLSA's minimum wage provision. The Court will deny Defendants' Motion for Judgment except as to the minimum wage claim; grant judgment to the Plaintiff on the other claims; grant the request for an injunction; require Defendants to produce additional payroll records; require the Plaintiff to recalculate the damages in accordance with the principles outlined herein; give Defendants an opportunity to object to the recalculated damages; and issue a separate judgment in accordance with this opinion after receiving the new damages calculations and any objections thereto.

# I. FINDINGS OF FACT

Prior to trial, the parties stipulated that the employees were non-exempt and were required to be paid overtime compensation. [*See* R. 64] These employees worked for the Defendants as "hot walkers" and/or "grooms" at various times during the relevant time period. [*See* R. 64] Hot walkers cool down horses after a training session by walking them around the track; grooms ready the horses for their next training session, handle the horses for races, and clean the horses' stalls. [*See* R. 129-4 at 46:1–49:25]. Most employees (both grooms and hot walkers) live in the racetracks in rooms located above and at the ends of the horse barns. [R. 129-4 at 49:11-24]

## A. General Compensation Structure for Both Hotwalkers and Grooms

Asmussen testified that grooms were paid $900.00 and (after a pay raise) $1,000.00 every two weeks, while hot walkers were paid $652.00 every two weeks. [R. 129-4 at 59:15–19; 62:12–14] Pete Belanto (an accountant who worked for KDE processing its payroll and who testified by deposition designation under Fed. R. Civ. P. 30(b)(6)) testified that Defendants paid the employees "a guaranteed minimum" plus extra sums for performing specific tasks. [*Compare* R. 129-4 at 618:15–619:5 *with* R. 129-4 at 87:5–10] Belanto and Asmussen described these bi-weekly lump sums as pay for a set schedule of regular and overtime hours as follows:

For grooms:

> 80 hours (40 hours per week, times two weeks) at $8.00 per hour
>
> 30 hours (15 hours per week) at $12.00 per hour

For hot walkers:

> 80 hours (40 hours per week) at $8.00 per hour

1 hour (half an hour per week) at $12.00 per hour

[R. 129-4 at 104:14–21; 620:6–10; 674:6–14] Asmussen testified that the salaries did not vary with the hours the employees worked and did not change even if employees worked fewer hours than the schedule (which he characterized as a "schedule of the maximum hours they may work"), and explained that the employees were "paid a salary to exceed the hours in which they work." [R. 129-4 at 64:11–65:13; 87:6–7] Several employees, along with Assistant Trainers Galen Pruitt and Scott Blasi (who held management positions), likewise testified that employees received the salaries even if they worked fewer hours.[2] [R. 129-4 at 180:18–181:1; 206:6–10; 253:3–9; 314:5–13; 381:9–17; 422:13–17] Indeed, two of the grooms agreed on cross-examination that the time records that they kept were not what determine their salaries, and that the guaranteed schedule is what determines their pay. [R. 206 at 11-14; 216:12–25]

As mentioned, in addition to the "guaranteed minimum salary," both grooms and hot walkers were paid additional sums for performing "extra" tasks, such as walking a horse to a race, feeding and watering horses, holding horses for the blacksmith, and doing laundry. [R. 129-4 at 87:8–10; 65:14–65:6; 307:2–308:17] According to Belanto, sometimes these tasks were done during "normal hours," and sometimes they were done "later on in the day." [R. 129-4 at 630:13–16; 631:17–19] It is clear from the testimony that at least some of the extras were done outside the normal schedule of working hours. For example, Pruitt testified that the horses were fed at 11:00 a.m., which is outside the scheduled hours for both hot walkers and grooms. [R.

[2] The Court notes that on at least one occasion, one of the hot walkers was apparently only paid for eleven days out of a pay period. [*See* Ex. JX-6 at p. 1] Blasi testified that this meant that the employee had only worked eleven days of "the set schedule," and that this was likely because she started in the middle of a pay period. [R. 129-4 at 422:18-423:1]

129-4 at 363:22–23]

Asmussen testified that employees were always paid "[a] set amount that exceeds the hours in which [sic] the task takes" for such extras. [R. 129-4 at 66:3–5] As the Court's previous Memorandum Opinion found, Belanto testified that the set amounts "would always compensate the employees at a rate of at least time and a half." [R. 74 at p. 3 (citing deposition testimony later submitted at R. 129-4 at 655:12–23)] Belanto declined to characterize these payments as a flat fee, explaining that "[i]t's an hourly deal" and that Defendants "estimate . . . the amount of hours it will take to do" a task and then paid time and a half on that estimate. He further explained that if employees performed the task in less time than the estimate, they received the full amount according to the estimate, while if it took longer (which he testified it seldom does), employees would get paid more. [R. 129-4 at 631:22–632:10] The Court notes, however, that many if not all of these purportedly estimated–hours–based payments for extras were not multiples of 8 or 9 (the purported hourly rates for straight-time hours) nor 12 or 13.50 (which would be 1.5 times the respective straight-time rates). [*See, e.g.*, 129-4 at 66:3–7 (testifying that set amounts for extra tasks were $25.00, $50.00, or $100.00 per task); 630:2–6 (testifying that two extra hours corresponded to $25.00)]

Whether performed in "straight-time" (non-overtime) hours or in overtime hours, it is clear Defendants did not track the actual time employees spent working their normal schedules or performing these extra tasks. Employees did fill out at least some timesheets for the relevant period. But as discussed below, it is abundantly clear that the timesheets were highly inaccurate to the point of being almost unusable (despite the fact that, according to at least one hot walker, the foremen told the hot walkers how many hours they had worked on the Wednesday before

payday, and that was the number of hours that hot walkers turned in and the foremen reported). [R. 129-4 at 166:21–25] For example, at least one employee testified that he filled out his timesheets for the Thursday and Friday before pay period in advance. [R. 129-4 at 166:1-25] Further, Asmussen himself admitted at trial to numerous specific examples of the timesheets not matching the payroll records. [R. 129-4 at 67:1-87:7] In fact, he testified he would not be surprised if the timesheets "never" matched the times listed on the payroll records. [R. 129-4 at 70:3-8] Pruitt testified that if a hot walker finished his work an hour or two earlier than normal, he or she would record on the timesheet the set schedule rather than the actual hours worked. [R. 129-4 at 318:9–20] When asked by the Court what the purpose of the timesheet was given that it only recorded the schedule and not the reality of actual hours worked, Pruitt responded "payroll," and agreed that Defendants would pay the employees according to the set schedule regardless of what the timesheet reflected, but explained, "you got to have names, employees' names." [R. 129-4 at 381:23–382:5] Blasi similarly testified that hot walkers never came back every afternoon, and that the timesheets appearing to show hot walkers working every afternoon were not correct. [R. 129-4 at 408:12–17; 409:1–410:25]

As to the hours spent on extra tasks, the Court previously noted that "there is no dispute that employees did not record the actual hours they worked for each task on their timesheets." [R. 74 at p. 3 (citing deposition testimony later submitted at R. 129-4 at 630:1–631:25)] Instead, the foremen and one of the assistant trainers kept separate records called "time notes" that they sent to Belanto. [R. 129-4 at 403:9–33] Only three pages of these notes were submitted at trial for the entire two-year time frame at issue. [*See* Ex. JX-6] As described in the previous Memorandum Order, "[t]he notes are undated and simply state the number of days worked by

each employee in the pay period (such as '2 weeks'), as well as additional sums earned (such as '+25.00'), presumably in relation to the extra tasks that employees may undertake throughout the week." [R. 74 at p. 10; Ex. JX-6] The Court has previously found that "this handful of general and undated notes cannot take the place of an affirmative act verifying that an employee worked a fixed number of hours." [R. 74 at p. 10]

Adding to the unreliability of the timesheets is the fact that Belanto, who was in California and had to overnight the payroll checks for Friday delivery, prepared the payroll before he even received a full set of timesheets or time notes. Every other Friday was payday, and the foremen sent him the time notes on Wednesday and the timesheets on Thursday, meaning that each payroll check was partly based on a certain number of estimated hours for the remainder of the pay period. [R. 129-4 at 418:4-9; 371:5–372:18; 616:19–617:3] Belanto testified that when doing Defendant's payroll, he spot-checked the time notes (using the timesheets), but that he usually worked off the time notes. [R. 129-4 at 629:12-20; 639:1-21] He explained that between the time notes and "the guaranteed minimum," he "know[s] exactly the hours they're going to work." [R. 129-4 at 685:1–5]

Some of the assistant trainers alluded to the existence of a third document, maintained by the assistant trainers and foremen, tracking employee time. Blasi testified that the foremen kept an "employee schedule book" that in some way allowed them to know whether employees worked in the afternoon. He further testified that when Defendants did the payroll, Blasi went over this document with his foremen. [R.129-4 at 428:19–429:12] Blasi also testified that the foremen kept an "employee chart book" from which they transferred information onto the time notes. [R. 129-4 at 419:4–12] It is unclear what this document is. Pruitt similarly testified that

the foremen kept a "time logbook" that apparently was separate from the timesheets. [R. 129-4 at 382:6–16] He described this document as recording extras as "plus two hours or plus $25." [R. 129-4 at 382:20–23] The Court notes that this description is very similar to that of the time notes, which have been held to be insufficient records of hours worked. [R. 74 at p. 10] And while Pruitt claimed that they recorded some hours on this "time logbook" or "employee chart book," in any event, no such document was ever produced at trial. Numerous witnesses testified that if there were payroll mistakes (such as failure to pay for additional race hours or extra tasks), such mistakes would be noted and remedied in the next paycheck. However, the Court received into evidence at trial no documents that could have served as the source of any such corrections.

**B. Hours Worked by Grooms**

The grooms and the hot walkers worked different hours. The parties agree that the grooms generally worked around 52.5 hours per week (though Defendants claim they paid them for 55 hours a week, or 110 hours per pay period). [R. 129-4 at 104:14–21; 205:15–25; R. 128 at p. 3, ¶ 10; R. 129 at p. 7, ¶ 13] Grooms typically worked around 7.5 hours a day, seven days a week: generally in the morning from 5:00 to 11:00 a.m., and then in the afternoon from 3:00 to 4:30 or from 3:30 to 5:00. [R. 129-4 at 50:3–25; 190:1–25; 192:6–11; 317:18–23]

However, the grooms' hours clearly fluctuated from this schedule. According to the testimony of Asmussen, Blasi, and groom Bertario Aragon, grooms sometimes started after 5:00, stopped before 11:00, worked past 11:00, quit early in the afternoon, or took the afternoon off, depending on the day. [R. 129-4 at 50:13–19; 51:1–12; 189:17–18; 190:23–25; 388:18–389:13] And according to the testimony of Asmussen, Blasi, Pruitt, and Foreman Luis Alberto Behena, the grooms worked additional hours during horse races. [R. 129-4 at 51:6–12; 55:14–56:24;

327:19–328:6; 389:12–13; 367:16–18] However, the testimony shed little light on the extent and amount of the fluctuations from the normal schedule, and in any event, the parties agree that **52.5 hours** per week (or **105 hours** per bi-weekly pay period) is a general estimate of the total hours worked by grooms.

### C. Hours Worked by Hot Walkers

The parties dispute how many hours per week hot walkers worked, largely because they dispute how often hot walkers came back to work in the afternoon, but also because it is unclear whether hot walkers worked for 5 or 5.5 hours every morning. In their Proposed Findings of Fact and Conclusions of Law submitted before trial [R. 106], Defendants asserted that Hotwalkers work "seven days a week, from 5:30 a.m. until around 11:00 a.m." and "[o]n alternate afternoons . . . from 3:30 [p.m.] until 5[:00 p.m.]," and worked a total of 42.5 hours a week. [R. 106-1 at p. 2, ¶ 8 (citing R. 74 at pp. 3, 12–13)] The Court notes that in their most recent Proposed Findings of Fact and Conclusions of Law submitted after trial [R. 129], Defendants did not include a specific number of weekly hours the hot walkers actually worked and that they shortened the hours they say the hot walkers worked to 5:00 a.m. to 10:00 a.m. and 3:00 p.m. to 4:30 p.m. The Court further notes that the 42.5 hours figure is consistent with the previous Memorandum Opinion entered at [R. 74], which Defendants cited in their previous Proposed Findings of Fact and Conclusions of Law (and which relied on Asmussen's pretrial deposition testimony, later used for impeachment purposes at trial, to note that hot walkers worked approximately 38 to 42.5 hours per week). [R. 74 at p. 2]

At trial, Asmussen testified that the hot walkers work anywhere from 38 to 39.5 hours per week and additional hours during horse races. [R. 129-4 at 54:10–13; 55:14–56:24] But

Asmussen admitted to agreeing in pretrial deposition testimony that the hot walkers worked between 38 and 42.5 hours per week. [R. 129-4 at 54:14–55:4] Angel Valle (who worked as both a hot walker and a groom) agreed at trial that he worked between 39.5 and 41 hours per week as a hot walker. [R. 129-4 at 151:22–24] Another hot walker, Gisela Arano Santos, agreed that she works 39.5 hours per week, not counting races, plus additional hours for races. [R. 129-4 at 263:6–10] Hot walker Aura Aguilar responded that she "wouldn't know" when asked at trial if she worked about 39.5 hours per week. [R. 129-4 at 291:23–25] In response to inquiries from defense counsel, hot walker Francisco Aragote-Martinez tentatively responded that that he thought he worked about 39.5 hours per week, though he had not done the calculations. [R. 129-4 at 311:20–25]

**a) Morning Hours**

Asmussen and three of the four hotwalkers who testified at trial (Valle, Santos, and Aguilar) all testified that the hot walkers typically started work in the morning at 5:00 and worked until 10:00, seven days a week.[3] [R. 129-4 at 51:23–52:3; 148:22-149:17; 260:15-19; 291:15-18] Regardless, the hot walkers' hours clearly fluctuated just as the grooms' hours did. Asmussen, Aguilar, and Aragote-Martinez all testified that the hot walkers sometimes stopped working before 10:00 a.m. [R. 129-4 at 52:4-5; 292:4-12; 314:5-10] Asmussen, Santos, and Aguilar further testified that hot walkers sometimes finished early in the afternoon, and worked additional hours when horses were racing (sometimes because they were performing "extra"

[3] Santos admitted that her timesheets for certain time periods in the late spring and early summer of 2014 reflect that she worked from 5:00 to 11:00 in the mornings, though she eventually testified that she only worked until 10:00 a.m. and that the timesheets in question mistakenly reflected the hours a groom would work. [R. 129-4 at 264:22–265:17; 266:12–15; 277:1; 281:16–282:11]

jobs). [R. 129-4 at 55:14–56:24; 261:20–262:2; 292:11–12] The other hot walker, Aragote-Martinez, testified that he stops, on average, at 10:30 a.m. — "sometimes a little later, sometimes a little earlier, depending on the work," and that the latest he had ever worked in the morning was "around there, 10:30, 11:00." [R. 129-4 at 303:24–304:3] Behena testified that hot walkers work five hours in the morning, but also consistently testified that the hot walkers typically work from 5:00 a.m. to 10:30 a.m., and sometimes quit before 10:30 (with extra hours if there are horse races). [R. 129-4 at 339:20–21; 326:9–16] But another foreman, Hugo Morales, testified that if the hot walkers start at 5:00 a.m., their schedule ends at 10:00 a.m. [R. 129-4 at 353:2–4] Pruitt similarly testified that hot walkers work from 5:00 to 10:00, and that hot walkers sometimes get out an hour and a half or two hours early. [R. 129-4 at 373:18–374:12] Blasi likewise testified that hot walkers typically work from 5:00 to 10:00, but might stop before 10:00 on some days and might work to 10:15 on other days, depending on the day. [R. 129-4 at 390:3–13]

Weighing all the evidence received at trial, including the Court's own observations of the witnesses and their demeanors, and consistent with Defendants' pretrial position on the number of hours hot walkers worked, the Court credits the testimony that hot walkers typically worked every morning from 5:00 to 10:30, for an average of 5.5 hours every morning of the week (with unknown variations above and below this number). This means that hot walkers worked 38.5 (5.5 x 7) morning hours per week.

**b) Afternoon Hours**

It is clear that hot walkers generally worked some afternoons every week. For the most part, the testimony at trial was generally consistent on the fact that they worked three or four

afternoons per week, and might work some additional hours or afternoons when there were horse races at the track where they are working. Asmussen testified that he believed hot walkers worked in the afternoons three days a week for about an hour or an hour and a half, though he indicated he was not exactly sure. [R. 129-4 at 52:9–11] The four hot walkers who testified at trial all testified to generally working from 3:00 to 4:30 when they worked afternoons. Valle testified that when he worked as a hot walker, it would be fair to say that he worked three or four days a week in the afternoon (three one week and four the next, for a total of seven afternoons in a two-week pay period), normally from 3:00 to 4:30, although he indicated this was not an exact time. [R. 129-4 at 150:1–151:1; 182:10–19] He specifically denied ever working every day in the afternoon, though he said he worked additional hours on race days at Keeneland (which he testified take place from Wednesday to Sunday in the month of April). [R. 129-4 at 156:2–5; 157:7–18] Santos explained that she worked in the afternoon three days per week, from 3:00 to 4:30, and sometimes worked additional afternoons (sometimes every afternoon) when there were horse races. [R. 129-4 at 160:20–23; 261:8–23; 264:25–265:3] Aguilar testified that she worked three afternoons per week, typically from 3:00 to 4:30, with "sometimes an [additional] hour" during races. [R. 129-4 at 291:12–14, 292:11–12] Aragote-Martinez testified that he worked from 3:00 to 4:30 in the afternoons, and that he did not work every afternoon, but the number of afternoons he worked per week varied and depended on how much work there was. [R. 129-4 at 304:10–25]

The testimony from management was generally consistent with that of the hot walkers on this point. Behena testified that hot walkers typically worked at least two or three afternoons per week from 3:00 to 4:30, and sometimes later on days when there are horse races (on which days

their schedules varied). [R. 129-4 at 326:22–327:9] Morales testified that hot walkers work from 3:00 p.m. to 4:30 p.m., three times a week. [R. 129-4 at 353:11–16] Pruitt and Blasi testified that hot walkers usually come back "every other afternoon." [R. 129-4 at 375:5–7; 390:14–16] The Court notes that — since "every other afternoon" means either three or four afternoons in a week, depending on which day one starts — this can be read to imply that hot walkers work 1.5 hours 3 afternoons one week and 4 afternoons the next week, for a total of 10.5 afternoon hours per bi-weekly pay period or 5.25 hours per week. Indeed, this is exactly how Defendants summarized the evidence in their "Key/Legend for KDE/Asmussen Summary of Evidence Received by the Court." [R. 129-2 at p. 1]

Despite the generally consistent trial testimony on this point, the twist is the documentary evidence (such as it is), namely, the timesheets. At trial, the Plaintiff introduced timesheets covering several months in 2014 and 2015. [*See* Exs. PX-3, PX-4] Asmussen ceded at trial that he did not produce timesheets for 2014 past July 4, 2014 (despite employees working past that date in 2014). [R. 129-4 at 81:1–6] Plaintiff states that the timesheets for the period prior to the filing of this suit showed hot walkers working *every* afternoon of the week, and only started to show the hot walkers working two to three afternoons per week after "the investigation that led to the filing of this lawsuit," in which investigators from the Department of Labor ("DOL") visited Churchill Downs in June 2014. [R. 128-1 at p. 4] Plaintiff further argues that "[t]here is no explanation why the timesheets seem to have changed after investigators showed up at the racetrack." [R. 128-1 at p. 6]

At trial, plaintiff's counsel confronted Asmussen with numerous examples of the pre-June 2014 timesheets which appeared to show hot walkers repeatedly working every afternoon.

[*See, e.g.,* R. 129-4 at 70:9–25; 72:13–22; 78:10–79:6; 88:24–89:7; 90:12–91:9] He insisted that hot walkers do not return every afternoon, and testified that he believed several of these timesheets were examples of the hot walkers mistakenly writing down their hours (though it was unclear if he had sufficient personal knowledge to support this belief). [R. 129-4 at 71:9–17; 73:11–12; 79:9–10; 91:7-9] He further testified that some employees were unable to read, write, or fill out the timesheets, and that some employees relied on others to write down their time. [R. 129-4 at 109:21–110:2]

Blasi denied that hot walkers were instructed to only record two or three afternoons per week after DOL investigators visited Churchill Downs, and said that they struggled to fill out the timesheets due to a lack of education and often had someone else fill out their timesheets for them. [R. 129-4 at 411:6–14] In fact, he described the timesheets as too inaccurate to use for payroll purposes:

> The Court: So is it accurate that employees were really paid off the time notes, not the timesheets?
>
> Blasi: The timesheets, they just became too inaccurate. Too many of them couldn't read or write or fill them out properly. And although we tried to require them to fill it out to comply, at the end of the day, there's just too many of them that were incorrect.

[R. 129-4 at 429:11–17]

Santos agreed at trial that she inaccurately filled out a certain timesheet reflecting the hours of 5:00–11:00 a.m. and 3:30–5:00 p.m. every day, and that the timesheet did not reflect the hours she actually worked. [R. 129-4 at 281:23–284:1] Similarly, Aguilar testified that she cannot read or sign her name, and that her husband fills out and signs her timesheets for her. [R. 129-4 at 294:3–295:7]

The Court finds all of this testimony generally credible. Though the pre-June 2014 timesheets cause suspicion, they are insufficient to overcome the consistent testimony from multiple witnesses that hot walkers worked generally every other afternoon. In light of the testimony about the inaccuracies of the timesheets and the difficulties that employees faced in accurately filling out timesheets due to illiteracy and the language barrier, the Court finds that the hot walkers did not actually return every afternoon, but returned every other afternoon.

Plaintiff further argues that Asmussen's testimony at trial conflicts with a document, signed by one of the assistant trainers and admitted at trial, indicating that hot walkers work every afternoon from 3:00 to 4:30 [R. 128-1 at p. 6] The document, styled "H2B Horseman Intake," lists basic information about Defendants and their employees. Under "Work Schedule," it lists "Hours" for all three job titles covered ("Groom, Hotwalker, Exercise Rider") as "5-10:30-3:4:30," and lists seven days per week for these hours. [Ex. PX-6 at p. 1] However, Blasi (the trainer who signed the document) testified that this "was the description of the help that I was trying to get" from employees on H-2B visas, and due to the non-specific nature of the form, did not reflect the hours that each employee would work each day. [R. 129-4 at 398:8–20] The Court finds this testimony to be a reasonable explanation for the discrepancy between the H2B Horseman Intake form and the testimony at trial.

To recap, no testimony indicated at trial that the hot walkers worked every afternoon (except possibly during races, but the testimony was undeveloped on that point). The Court credits the testimony over the timesheets, and finds that the hot walkers worked for approximately 1.5 hours in the afternoon, for 3 afternoons one week and 4 afternoons another week per each bi-weekly period, for an average of 5.25 afternoon hours each week (and a total of

10.5 afternoon hours per bi-weekly pay period). In addition, the Court finds that the testimony and records demonstrate the hot walkers occasionally performed additional tasks outside their normal work schedule on race days and performing "extras." Due to the lack of record-keeping by Defendants, it is impossible to estimate the amount with precision. However, a conservative estimate, based on the testimony, records, and pay stubs, is an additional hour per pay period (or an additional .50 hours each week). Accordingly, the Court finds that the hot walkers worked for an approximate total average of **44.25 hours** each week: 38.5 (morning hours) + 5.25 (afternoon hours) + .50 (race days/extras), ultimately totaling an average of **88.50 hours** per bi-weekly pay period.

## II. CONCLUSIONS OF LAW – THE FAIR LABOR STANDARDS ACT

As an initial matter, this Court has jurisdiction over this matter pursuant to 29 U.S.C. § 201 *et seq*. Further, Defendants stipulated that they are covered by the FLSA, [*see* R. 116], and Asmussen admitted in his answer to the amended complaint that he qualifies as an employer under section 3(d) of the FLSA, 29 U.S.C. § 203(d). [*See* R. 43 at p. 2; R. 59 at p. 2] Therefore, the Court finds that both Defendants are "employers," as contemplated by 29 U.S.C. § 203(d), and that Asmussen is individually liable for any damages found by the Court to be due. *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965-66 (6th Cir. 1991).

By way of background, "Congress passed the FLSA with broad remedial intent to address unfair methods of competition in commerce that cause labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers. The provisions of the statute are remedial and humanitarian in purpose, and must not be interpreted or applied in a narrow, grudging manner." *Monroe v. FTS USA, LLC*,

860 F.3d 389, 396–97 (6th Cir. 2017) (cleaned up) (citations omitted). Courts "thus construe the Act's definitions liberally to effectuate the broad policies and intentions of Congress." *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994) (cleaned up) (citation omitted). Bearing these principles in mind, the Court finds that Defendants are liable for violations of the FLSA's overtime and recordkeeping provisions, but not the minimum wage provision.

**A. Minimum Wage Claims**

Section 6 of the FLSA, the minimum wage provision, requires covered employees to be paid at least $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). The Court finds that Defendants did not violate the FLSA's minimum wage provision. As explained above, hot walkers were typically paid a base salary of $652.00 for a two-week period, making their weekly wage $326.00. And as mentioned, hot walkers worked, on average, a week of 44.25 hours. This wage ($326.00) divided by 44.25 hours yields an hourly rate of $7.37, which is greater than the minimum wage. Likewise, the grooms were typically paid a base salary of $900.00 or $1,000.00 for a two-week period (making their weekly wage at least $450.00 per week) and worked an average of 52.5 hours per week. The smaller wage ($450.00) divided by the workweek (52.5 hours) also yields an hourly rate ($8.57) that is above the minimum wage. Accordingly, the Court finds that Defendants are entitled to judgment on the Section 6 minimum wage claim.

**B. Record-keeping Violations**

"The Act also imposes recordkeeping requirements on employers, *see* 29 U.S.C. § 211(c), and empowers the Department of Labor to enjoin violations of these requirements, *see id.* §§ 215(a)(5), 217." *Acosta v. Min & Kim, Inc.*, 919 F.3d 361, 363–64 (6th Cir. 2019) ("*Min & Kim II*"). As the Court's previous Memorandum Opinion explained,

> The Defendants do not argue that their record-keeping practices are compliant with Section 11 under 29 C.F.R. § 516.2(a)(7), which requires employers to keep records of '[h]ours worked each workday and total hours worked each workweek.' Rather, they . . . conten[d] that their record-keeping practices are compliant with Section 11 under an alternative regulation, 29 C.F.R. § 516.2(c). This regulation applies to employees working 'fixed schedules' and states that:
>
>> With respect to employees working on fixed schedules, an employer may maintain records showing instead of the hours worked each day and each workweek as required by paragraph (a)(7) of this section, the schedule of daily and weekly hours the employee normally works. Also,
>>
>> (1) In weeks in which an employee adheres to this schedule, indicates by check mark, statement or other method that such hours were in fact actually worked by him, and
>>
>> (2) In weeks in which more or less than the scheduled hours are worked, shows that exact number of hours worked each day and each week. 29 C.F.R. § 516.2(c).
>
> This regulation is an exception to the normal record-keeping obligations under Section 11 and requires less stringent documentation.

[R. 74 at p. 8 (quoting 29 C.F.R. § 516.2(c)).]

The Court's previous Opinion granted summary judgment to the Plaintiff for his Section 11 record-keeping claims for the years of 2012 and 2013, as well as for "the additional tasks that earned lump sum payments," since "there are no records indicating the number of hours employees spent" on these tasks. [R. 74 at p. 11] However, the Opinion denied summary judgment as to the Section 11 record-keeping claim for the year of 2014, because whether the employment records for that year (the timesheets and the payroll records) were so inconsistent as to violate the FLSA was a genuine issue of material fact. *Id.* at p. 10. As the Opinion explained, "a handful of mistakes or aberrations, alone, cannot amount to a Section 11 violation," and while it is clear that there are some inconsistencies, it is the responsibility of the parties to produce

evidence of how many inconsistencies exist and the extent of the errors. *Id.*

While neither party has produced any sort of summary comparing the timesheets and the payroll records, it is abundantly clear from the testimony at trial (notwithstanding Belanto's testimony that he used the timesheets to help prepare the payroll) that the timesheets contained so many inaccuracies that they were essentially useless for payroll purposes. Further, as noted, the only other records that could have been used to prepare the payroll were the "time notes," and this Court's previous Opinion found that "this handful of general and undated notes" were insufficient to count as records tracking actual hours worked. [R. 74 at p. 10] Thus, the hours reflected on the payroll records are of no help to Defendants, since there is no original source of accurate hours to go into them. Defendants have produced no evidence to contradict this testimony and show that the inaccuracies of the records are isolated or *de minimis*. Accordingly, the Court finds that Plaintiff is entitled to judgment on the 2014 Section 11 recordkeeping claim.

**C. Overtime Claims**

As the Sixth Circuit has explained, "[t]he Fair Labor Standards Act requires employers to compensate employees at one and one-half times their 'regular rate' if they work over 40 hours per week. 29 U.S.C. § 207(a)(1). The Act defines 'regular rate' as the total weekly pay divided by the weekly hours. *Id.* § 207(e); 29 C.F.R. § 778.109. All non-exempt employees are entitled to overtime pay calculated in this way, whether the employer pays them on an hourly basis or not." *Min & Kim II*, 919 F.3d at 363; *see also Giles v. City of New York*, 41 F. Supp. 2d 308, 316 (S.D.N.Y. 1999) (quoting *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 461, 464 (1948)) ("the Supreme Court has held that, for FLSA purposes, '[e]very contract of employment, written or oral, explicitly or implicitly includes a regular rate of pay for the person employed. . . . [T]he

regular rate of pay [is] to be found by dividing the weekly compensation by the hours worked.'"). When determining the regular rate, courts are "required to look beyond that which the parties have purported to do," as the regular rate is an "actual fact." *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 204 (1947). The FLSA makes clear that the "regular rate" is to include "all remuneration for employment paid to . . . the employee," apart from eight categories of payment not at issue here.[4] 29 U.S.C. § 207(e). The purpose of the overtime provision is twofold: to compensate employees for the burden of working a workweek in excess of hours fixed by the statute, and to spread employment among a greater number of people by making overtime hours more expensive than straight-time hours. *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161 (1945).

The propriety of lump sum payments for overtime worked by the hot walkers and the grooms depends on the interpretation and operation of a number of interpretive bulletins and other sources containing DOL interpretations of the FLSA: 29 C.F.R. § 778.309; 29 C.F.R. § 778.310; 29 C.F.R. § 778.114; and the DOL's Field Operations Handbook ("FOH" or "Handbook"), Ch. 32, ¶ 32j06. Here, Defendants claim to be in compliance with the FLSA's overtime requirements under three theories — through payment of a constant overtime premium for constant overtime hours worked per 29 C.F.R. § 778.309; through payments compliant with 29 C.F.R. § 778.114 (the Fluctuating Work Week "FWW" method); and through payment of flat task rates per the lump-sum provision in the DOL Handbook. The Court notes at the outset that

[4] While one of the statutory exclusions is for overtime payment and thus conceivably could be applicable to this case, because the Court finds that overtime payments were not made, it does not apply.

all of those arguments cannot factually be true. As it turns out, none of them are.

**a) 29 C.F.R. § 778.309 and 29 C.F.R. § 778.310**

One of the interpretive bulletins[5] issued by the DOL confirms the obvious proposition that a fixed lump sum paid as overtime for a constant amount of overtime worked consistently each week is acceptable under the FLSA (so long as it is properly calculated, of course):

> Where an employee works a regular fixed number of hours in excess of the statutory maximum each workweek, it is, of course, proper to pay him, in addition to his compensation for nonovertime hours, a fixed sum in any such week for his overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked.

29 C.F.R. § 778.309 (entitled "Fixed sum for constant amount of overtime"). However, the very next interpretive bulletin, 29 C.F.R. § 778.310, also makes clear that a fixed lump sum, paid for overtime hours that *vary* from week to week and without regard to the actual hours worked, is not acceptable — even if in implementation it would work out mathematically to a payment of full time and a half for all overtime hours actually worked:

> *A premium in the form of a lump sum which is paid for work performed during overtime hours without regard to the number of overtime hours worked does not qualify as an overtime premium even though the amount of money may be equal to or greater than the sum owed on a per hour basis.*
>
> For example, an agreement that provides for the payment of a flat sum of $75 to employees who work on Sunday does not provide a premium which will qualify as an overtime premium, even though the employee's straight time rate is $5 an hour

[5] The Court will not address the issue of how much deference is to be accorded to the interpretive bulletins issued by the DOL, because it is not necessary here. Defendants raise the issue in a footnote to their latest Proposed Findings of Fact and Conclusions of Law (suggesting that, because the DOL issued these interpretive bulletins without adhering to the standard notice and comment rulemaking procedures which are the hallmark of regulations to be accorded controlling deference, they are only entitled to "low-level deference to the extent that they have the 'power to persuade.'" [R. 129 at p. 14 n. 3 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))] However, Defendants rely heavily on the interpretive bulletins to argue that they have complied with the Act, and both parties' arguments inherently assume that these interpretive bulletins have at least "the power to persuade." The Court agrees that they do.

> and the employee always works less than 10 hours on Sunday.
>
> Likewise, where an agreement provides for the payment for work on Sunday of either the flat sum of $75 or time and one-half the employee's regular rate for all hours worked on Sunday, whichever is greater, the $75 guaranteed payment is not an overtime premium.
>
> The reason for this is clear. If the rule were otherwise, an employer desiring to pay an employee a fixed salary regardless of the number of hours worked in excess of the applicable maximum hours standard could merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked. The Congressional purpose to effectuate a maximum hours standard by placing a penalty upon the performance of excessive overtime work would thus be defeated.
>
> For this reason, *where extra compensation is paid in the form of a lump sum for work performed in overtime hours, it must be included in the regular rate and may not be credited against statutory overtime compensation due*.

29 C.F.R. § 778.310 (entitled "Fixed sum for varying amounts of overtime") (emphasis added); *see also United States Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 283 (4th Cir. 2019) ("Section 778.309 applies only when an employee works a *fixed* number of overtime and non-overtime hours.").

As one district court recently explained, under Section 309, "[w]hile somewhat counterintuitive, it is . . . evident that the FLSA prohibits paying a fixed daily sum where the hours vary, but never go above a set maximum. For example, it is proper under the FLSA to pay a fixed sum of $1,060 per week for *exactly* 84 hours of work each week and to characterize this as a $10 per hour base-rate." *Senegal v. Fairfield Indus., Inc.*, No. CV H-16-2113, 2018 WL 6079354, at *6 (S.D. Tex. Nov. 21, 2018) (emphasis added) (explaining calculations as "[t]welve hours per day at seven days per week equates to 84 hours per week. $10 x 84 = $840. $5 (overtime premium) x 44 (overtime hours) = $220. $840 + $220 = $1,060"). The court went on,

"[h]owever, it would be improper to pay the same rate of $1,060 per week for a *varying* number of hours each week *even if the varying number of hours never exceeded 84*. Although the second scenario would seem to benefit the worker as he would make the same pay, never work more than he did in the first scenario, and would presumably work less on occasion, such a scenario is expressly prohibited because it is against the purpose of the FLSA to 'effectuate a maximum hours standard.'" *Id.* (emphasis added) (quoting 29 C.F.R. § 778.310).

In so reasoning, the *Senegal* court was applying a well-established interpretation of the FLSA and the congressional intent behind it. For example, in *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 423–24 (1945), cited by Defendants, the Supreme Court explained in a case involving the calculation of overtime for workers on a "piece rate" system that "by increasing the employer's labor costs by 50% at the end of the 40-hour week and by giving the employees a 50% premium for all excess hours, Section 7(a) achieves its dual purpose of inducing the employer to reduce the hours of work and to employ more men and of compensating the employees for the burden of a long workweek." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 423–24 (1945) (citations omitted). Thus, the Court said, while employers and employees "are free to establish th[e] regular rate at any point and in any manner they see fit. [And] [t]hey may agree to pay compensation according to any time or work measurement they desire . . . this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes." *Id.* (citations omitted). Thus, it is clear that Defendants' claim that 29 C.F.R. § 778.309 applies where employees work "fairly consistent overtime hours" and have agreed to a fixed sum for overtime is simply wrong. The non-binding authority they cite to the contrary is unpersuasive.

[*Contra* R. 129 at p. 17]

As *Min & Kim II* explained in analyzing Section 310, while "[a]n employer may lawfully . . . star[t] with a fixed salary and a shift schedule and wor[k] backwards to compute hourly and overtime rates," "[a] salary that supposedly includes overtime pay but does not vary with actual hours worked cannot include 'overtime' as the Act defines it." *Min & Kim II*, 919 F.3d at 364 (citing 29 C.F.R. 778.310); *see also* 29 C.F.R. § 778.403 ("Section 7(f)[6] is the only provision of the Act which allows an employer to pay the same total compensation each week to an employee who works overtime and whose hours of work vary from week to week."). In other words, an employer is not entitled to flout 29 C.F.R. § 778.310 (by paying lump sums for *varying* amounts of overtime, i.e., where Section 309 does not apply) and then claim "no harm, no foul." Instead, the alleged overtime is included in the regular rate as straight-time pay, and does *not* count toward the overtime premium due the employee for hours worked past 40. As the District Court explained (and the Sixth Circuit subsequently affirmed) in *Min & Kim I*:

> Although it is possible that Defendants might have paid employees the same wages had they complied with the FLSA recordkeeping and overtime requirements, this does not excuse them from FLSA non-compliance here. . . .It is possible that Defendants could pay their employees the same amounts if they selected an hourly rate and paid overtime compensation as required by the FLSA, as they did with their system of paying a "guaranteed wage," but *what matters is not just the end result, but the methodology used.* The reason for compliance is to ensure that employees are indeed paid overtime. Without adhering to the system required by the FLSA, employees lose the protection of that statute and have no way of proving that they are entitled to overtime pay. The Supreme Court has held that "when employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the remedial nature of [the FLSA] and the great public policy which it embodies" cannot be vindicated.

[6] Defendants have not argued that this section (section 207(f), the so-called "Belo exception") applies.

*Acosta v. Min & Kim Inc.*, No. 15-CV-14310, 2018 WL 500333, at *7 (E.D. Mich. Jan. 22, 2018), *aff'd,* 919 F.3d 361 (6th Cir. 2019) ("*Min & Kim I*") (emphasis added) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) and *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989)).

Turning to the facts of this case, the Court has already found that the hours that the employees worked from week to week fluctuated depending on if they arrived early, stayed late, left early, worked additional hours on race days and worked outside the normal scheduled hours performing "extras." *See supra* Sections I.B and I.C. Accordingly, Defendants did not comply with 29 C.F.R. § 778.309, which requires "a *regular fixed* number of hours in excess of the statutory maximum each workweek." 29 C.F.R. § 778.309 (emphasis added). While it is true that the Court's prior opinion, in the context of analyzing 29 C.F.R. § 778.309, stated that Defendants' proffered calculations of the grooms' and hot walkers' hourly rates ((80 hours x $8.00) + (30 hours x $12.00) and (80 hours x $8.00 + 1 hour x $12.00), respectively) "*could* satisfy the minimum wage and overtime requirements of the FLSA because [they] pa[y] more than the federal minimum wage and it pays time and a half for hours worked over a forty hour workweek," it then explained that "[t]he inquiry, however, does not end here" and that the parties disputed whether the employees satisfied the requirements to be subject to Section 309: working "a regular fixed number of hours in excess of the statutory maximum each workweek" and agreeing to be subject to such a salary plan. [R. 74 at pp. 13, 14 (emphasis added)]

As already noted, the Court has found that the former requirement was not met because the grooms and hot walkers did not work a "regular fixed number of [overtime] hours"; thus,

consistent with the Court's prior opinion, Defendants' pay plan did not satisfy the FLSA's overtime requirements through compliance with Section 778.309. *See Acosta v. Wok on Wheels USA, LLC*, No. SA16CA902FBHJB, 2019 WL 4087621, at *5 (W.D. Tex. June 11, 2019), *report and recommendation adopted in part,* No. SA-16-CA-902-FB, 2019 WL 5026936 (W.D. Tex. July 26, 2019) ("§ 778.309 applies only when an employee works a *fixed* number of overtime and non-overtime hours. The evidence before the Court indicates that was not the case here. In fact, Defendants admit that employees may have taken a day off or went home early, which was a common occurrence, and Defendants did not track the [employees'] breaks . . . . For these reasons, § 778.309 does not apply.") (citations omitted).

Defendants argue that the grooms and hot walkers worked fixed schedules because "their 'hours [were] at the mercy of the racetrack,'" which opens and closes at a certain time. [R. 129 at p. 20] They also argue that under *Adams v. Dep't of Juvenile Justice*, 143 F.3d 61, 67 (2d Cir. 1998), "[s]o long as the hours worked are fairly similar most work weeks, as here, that brings Defendants within the bulletin." *Id.* But the *Adams* court neither said nor implied any such thing, and the facts of that case involved employees who worked consistent shifts. *Adams v. Dep't of Juvenile Justice*, 143 F.3d 61, 63, 67 (2d Cir. 1998). Similarly, Defendants argue that "[j]ust as in ordinary parlance, saying that Joe is a regular at the pub does not necessarily mean that he goes there every day." *Id.* For support, they cite to a statement in *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1313 n.10 (10th Cir. 2011) that "regular does not mean that it must be consistent." But Section 309 requires that the overtime be "a regular fixed number of hours," not just a regular number. What is more, *Chavez* did not deal at all with Section 309 or the interpretation of the term "regular fixed number of hours." Instead, *Chavez* discussed the term

"regular rate" and explained that the regular rate may vary from week to week. *Id.*

Instead, this case presents the same situation addressed by the Sixth circuit in *Min & Kim II*: an employer who failed to keep proper records of hours worked, and then paid a "guaranteed wage" salary that "supposedly include[d] overtime pay but d[id] not vary with actual hours worked." *Min & Kim II*, 919 F.3d at 364. As the Sixth Circuit explained, such a salary "cannot include 'overtime' as the Act defines it." *Id.* (citing 29 C.F.R. § 778.310). It does not matter that Defendants claim to have paid grooms for 55 hours per week rather than the 52.5 the parties agree they generally worked, since all that does is increase the size of the lump sum Defendants were trying to pay for varying hours. *See id.* (explaining that it "is neither here nor there" for purposes of FLSA overtime compliance whether an hourly rate is "generous by industry standards.") Thus, it is clear that Section 309 does not apply to this case.

**b) DOL's Field Operations Handbook, Ch. 32, ¶ 32j06**

The DOL's Field Operations Handbook does contain a provision which seemingly condones lump-sum payments for overtime hours:

> Under appropriate circumstances, and where close scrutiny reveals there is a clear understanding between the employer and the employee that a lump-sum payment is predicated on at least time and one-half the established rate, and that overtime payment is clearly intended, the fact that the payment is a lump sum will not result in a violation if it equals or exceeds the proper overtime payment due. For example, *during a limited period each year* hourly-rated employees worked after regular hours on a special job for their employer. Under a clearly understood agreement with his/her employees, the employer, based on experience paid for this *special job* in a lump sum arrived at by computing time and one-half the regular rate for the estimated special job hours, and then adding an additional bonus amount. This policy *shall be applied very narrowly* and shall not be applied to lump-sum payments which are nothing more than bonuses for working undesirable hours.

FOH Ch. 32, ¶ 32j06 ("Lump-sum overtime payment") (emphasis added), *available at* https://www.dol.gov/whd/FOH/FOH_Ch32.pdf. However, further examination reveals that this provision does not contradict Section 310 (which prohibits a fixed lump sum for overtime hours that vary). Aside from the previous order in this case, the only case to have even mentioned this handbook provision is a Fourth Circuit case from last year, *United States Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277 (4th Cir. 2019). In this case, the Fourth Circuit stated that this "provision solely applies for 'limited period[s],' where employers compensate employees with a lump sum for a 'special job' for an estimated number of overtime hours" and "is inapplicable for regularized work schedules that purportedly include overtime compensation." *Fire & Safety Investigation Consulting Servs*, 915 F.3d at 283. The Court finds this interpretation persuasive. This interpretation is grounded in the actual language of the Handbook and — particularly given that the provision by its own terms applies "[u]nder appropriate circumstances" and is "to be applied very narrowly" — is far more logical than interpreting the Handbook provision to conflict with (even swallow) the DOL's other guidance on this matter found at 29 C.F.R. § 778.310. It makes far more sense that the DOL would issue an interpretive bulletin stating a general rule against lump-sum payments of overtime for varying weekly overtime hours (29 C.F.R. § 778.310) and then include a "very narrow[]" exception to that rule for special jobs during a limited period of time (¶ 32j06), than to find that the DOL Handbook overrides the clear guidance in § 778.310.

The Court's previous Opinion is not inconsistent with this interpretation, since it explained that the Handbook provision "is not binding authority" but "is persuasive evidence of

the DOL's intent and should be considered."[7] [R. 74 at p. 19 (internal quotation marks and citation omitted)] Further, it explained that under this (non-binding) provision, "lump sum payments for extra job duties are not per se violations of the FLSA," but the Handbook provision "is clear that, not only must there be an understanding between the employer and employee regarding the payment arrangement of lump sums, but the flat fee must equal or exceed the proper overtime payment due." [R. 74 at p. 19] It then explained that there was a genuine issue of fact as to whether the employees actually were compensated at least time and a half for these additional tasks, given that employees did not record the hours they spent on them. *Id.* Importantly, however, just like Defendants' briefing on the Motion for Partial Summary Judgment, the Opinion implicitly assumed (*without* explicitly analyzing or deciding) that the Handbook provision could apply to a schedule of regularly worked overtime hours spent performing these "special tasks." Since the Court concludes that it cannot, the analysis of the application of the Handbook provision contained within the previous opinion, while correct insofar as it went, simply does not apply to the facts of this case.

The Court interprets the Handbook provision congruently with Sections 309 and 310. Under Section 310, since Defendants undeniably did not record the actual overtime hours spent

---

[7] What is more, even if the previous opinion *did* conflict with the interpretation of the Handbook provision set out in this opinion, having more fully considered the law and the facts including the testimony given during the bench trial, the Court would exercise its inherent procedural power to reconsider and modify this finding in light of the logic and authorities just discussed. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 946 (6th Cir. 2004) (citations omitted) (upholding district court's *sua sponte* reconsideration, after bench trial, of order granting partial summary judgment because "inherent procedural power" allows district courts to "reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient'"); *Sanders v. City of Pembroke*, No. 5:19-CV-23-TBR, 2020 WL 3065918, at *2 (W.D. Ky. June 9, 2020) (citation omitted) ("'[C]ourts will find justification for reconsidering interlocutory orders whe[re] there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct clear error or prevent manifest injustice.'").

on the "extra" tasks but merely paid flat fees for completion of the tasks, the money paid for these extra tasks was paid "without regard to the number of overtime hours worked," and therefore "does not qualify as an overtime premium even though the amount of money may be equal to or greater than the sum owed on a per hour basis." 29 C.F.R. § 778.310; *Senegal*, 2018 WL 6079354, at *6 ("[T]he FLSA prohibits paying a fixed daily sum where the hours vary, but never go above a set maximum."). The Handbook cannot inoculate Defendants' unlawful payment practices (either for all hours worked or only as to their payment practices related to the "extras") because neither the "extras" nor any other part of the employees' work at issue here, were "special job[s]" performed during "a limited period of each year," FOH Ch. 32, ¶ 32j06, but rather were recurring tasks performed with some frequency.

In sum, it is clear that employees who work *varying* amounts of overtime from week to week cannot be paid a constant lump sum as overtime compensation for a "maximum" amount of hours, but instead must be paid time and a half for the overtime hours *actually* worked.

**c) 29 C.F.R. § 778.114 — the Fluctuating Workweek Method**

Employers are always required to pay overtime to non-exempt employees at a rate of time and a half the regular rate. As the Sixth Circuit recently explained, however, "[v]arious methods can be used to calculate [the] overtime premium, depending on the particular employment circumstances. One such method is the 'Fluctuating Workweek' ('FWW') method, described in 29 C.F.R. § 778.114(a).[8] Under this approach, employees receive a fixed salary as

[8] The Court notes that the version of this bulletin which took effect August 7, 2020 is different from the version that was in effect up to and including the date of the bench trial, and that it is the former version that controls in this case.

compensation for all hours worked, whether above or below forty hours, *plus* an overtime premium for *each* overtime hour." *Hall v. Plastipak Holdings, Inc.*, 726 F. App'x 318, 320 (6th Cir. 2018) (emphasis added). "The FWW method can only be used if four requirements are met: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed salary that does not vary with the number of hours worked (excluding overtime premiums); (3) the fixed salary at least equals the minimum wage; and (4) the employer and employee share a 'clear mutual understanding' that the employer will pay the fixed salary regardless of the number of hours worked." *Id.* at 320–21 (citing 29 C.F.R. § 778.114(a)).

As explained in *Plastipak*, the formula for calculating the overtime premiums due on top of the salary under the FWW method is as follows:

$$\text{overtime premium} = \frac{1}{2} \times \frac{\text{salary}}{\text{40 hours} + \text{overtime hours}} \times \text{overtime hours}$$

*Id.* at 321. As *Plastipak*'s formula makes clear, 29 C.F.R. §778.114 uses total hours, including overtime, as the divisor.[9] Of course, under the FWW method, an overtime premium for hours worked past 40 must be made *in addition to* the constant weekly salary, and the premium must be directly tied to the number of overtime hours worked. "As the Fifth and Eleventh Circuits put it, 'the fluctuating workweek method is merely one way to meet the FLSA's overtime requirements — it is not an exception to those requirements.'" *Sherwood v. Cook Out, Inc.*, No.

[9] This makes perfect sense — as 29 C.F.R. §778.113 tells us, the regular rate for salaried employees is calculated by dividing the salary by the number of hours which the salary is intended to compensate, and as 29 C.F.R. §778.114 explicitly states, the whole point of the fluctuating workweek method is that an employer and employee may agree that a salary is intended as the *straight-time* compensation for *whatever* hours are worked in a workweek, be they few or be they many. *See* 29 C.F.R. §778.114 ("[T]he salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek . . . .").

5:16-CV-92-REW, 2019 WL 3976510, at *4 (E.D. Ky. Aug. 22, 2019) (citations omitted).

Applying the FWW to the facts in this case, neither any part of the bi-weekly salaries nor any of the flat fees paid for the "extra" tasks count as contemporaneous overtime premiums under the FWW method. Here, the Court has already found that the employees' hours fluctuated from week to week, and that their fixed salaries at least equaled the minimum wage (satisfying the first and third requirements for FWW). With respect to the second requirement, the parties do not dispute that the employees received a fixed salary that remained constant, regardless of the number of hours worked. [R. 74 at p. 18 ("There is no dispute as to the second element of the FWW plan because the parties agree that the hot walkers and grooms are subject to a fixed salary.")] However, under the FWW method, the fixed salary "*exclude[es]* overtime premiums," *Plastipak*, 726 F. App'x at 320 (citing 29 C.F.R. § 778.114(a)) (emphasis added), and here Defendants claimed that the fixed salaries *included* overtime premiums — despite the clear evidence that the employees worked varying overtime hours each week.

Plaintiff does appear to dispute the fourth requirement for application of the FWW method, that there was the requisite "clear mutual understanding" between employer and employee. The language of the FWW bulletin describes the required understanding as being "that the fixed salary is compensation (*apart from overtime premiums*) for the hours worked each workweek, whatever their number." 29 C.F.R. § 778.114 (emphasis added). As Plaintiff points out, Defendants "have never argued that the salaries that they pay represent compensation apart from overtime premiums," but have argued "that the salaries include an overtime premium." [R. 128 at p. 10] On the other hand, *Plastipak* described the required understanding as being "that the employer will pay the fixed salary regardless of the number of hours worked" and explained

that "a perfect understanding" of "every computational detail" is not required. *Plastipak*, 726 Fed. App'x 318 at 321, 323 (citing 29 C.F.R. § 778.114(a)).

Here, it is clear that the employees' salaries were intended to include all straight time for all hours worked (including regular and overtime hours) *plus* the overtime premium. But the trial testimony demonstrated that the salaries themselves did not change no matter how many or how few hours employees worked. While the extra tasks meant that some of the employees earned additional sums, these sums also did not change no matter how much or little time these extra tasks took (and as noted above, it is clear that both hot walkers and grooms sometimes worked additional hours over and above the ordinary schedule). Thus, Defendants did not satisfy the second or fourth prerequisites for application of the FWW method.

As discussed, the FWW method allows employers who meet the four prerequisites to pay overtime in the form of extra compensation, "*in addition to such fixed salary and any bonuses . . . and additional pay of any kind,* for all overtime hours worked at a rate of not less than one-half the employee's regular rate of pay for that workweek." 29 C.F.R. § 778.114 (emphasis added). Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, "the regular rate of the employee will vary from week to week and is determined by dividing the amount of the salary and any non-excludable additional pay received each workweek by the number of hours worked in the workweek." *Id.* But here, the actual hours worked in the workweek were clearly not tracked. The timesheets — of which the hours recorded on the payroll must have been derivative[10] — were too inaccurate,

[10] As no third "employee chart" or "logbook" was actually produced at trial, the Court does not consider the alleged third document tracking employee hours which the foremen claimed they kept.

the time notes too general (and too few), and as the Court previously ruled, the actual hours for the extras were not tracked. Indeed, as noted above, Asmussen himself testified he would be unsurprised if the timesheets and the payroll hours *never* matched. [R. 129-4 at 70:3-8] Blasi testified extensively as to the inaccuracies of the timesheets. [R. 129-4 at 408:12–17; 409:1–410:25; 429:11–17] Pruitt confirmed that Defendants paid their employees according to the set schedule rather than according to what the timesheets reflected. [R. 129-4 at 381:23–382:5] And as discussed, Belanto did the payroll calculations before the end of the second week in each bi-weekly period. Clearly, it was impossible for Defendants to properly calculate the regular rate under the FWW method, since the actual hours worked in the workweek were not tracked. Given that, they cannot possibly have properly calculated the overtime premium due under the FWW (and unsurprisingly, there is no evidence that they actually performed the calculation mandated under the *Plastipak* formula). In fact, employee testimony that Defendants themselves solicited — "the time records that [they] keep aren't what drive or dictate [Aragon's] salary," but "[i]t's the [guaranteed] schedule" — clearly demonstrates this. [R. 206 at 11–14]

Accordingly, for all the reasons just outlined, the Court finds that Plaintiff is entitled to judgment on the Section 7 overtime claim.

### D. Damages

#### a) Regular Rate

The FLSA authorizes injunctions to restrain the withholding of payment of overtime compensation found due to employees, and the Plaintiff seeks such an injunction as to the overtime damages due in this case. 29 U.S.C. § 217. Defendants violated the FLSA here by

failing to compute each employee's regular rate on a workweek by workweek basis for purposes of calculating overtime. As explained above, the FLSA requires employers to compensate non-exempt employees at a rate of time and a half their "regular rate" for all hours worked in excess of 40 hours. 29 U.S.C. § 207(a)(1). The Act defines "regular rate" as the "total weekly pay divided by weekly hours." *Min & Kim II*, 919 F.3d at 363; 29 C.F.R. § 778.109. "Weekly pay" for purposes of the calculation in this case includes all payment reflected in the payroll records for each employee – that is, the weekly salary plus payments for "extras" -- consistent with the general rule that the regular rate includes all renumeration for employment (statutory exceptions aside). 29 U.S.C. § 207(e); 29 C.F.R. § 778.109.

"Weekly hours" includes the "total number of hours actually worked by [the grooms and hot walkers] in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. The parties here agreed on a weekly salary inclusive of all regular and overtime hours. Since the employees have already been paid the straight time pay for all hours worked (including the overtime hours), the overtime premium due is equal to half-time pay (based on the regular rate for each week) for the hours in excess of 40 for each workweek. 29 C.F.R. § 778.113; 29 C.F.R. § 778.325; 29 U.S.C. § 207(a).

**b) Number of Overtime Hours**

Where, as here, "an employer's records fall short, the Department of Labor must establish the amount of time worked based on reasonable implications and inferences. In the words of the U.S. Supreme Court, the Department must show that employees 'performed work for which [they were] improperly compensated' and 'produce[ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.' Such a reasonable estimate

will suffice if the employer fails to 'negative the reasonableness of the inference.'" *Min & Kim II*, 919 F.3d at 365 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016)). "In FLSA cases, the use of representative testimony to establish class-wide liability has long been accepted." *Monroe*, 860 F.3d at 407–08. As the Sixth Circuit has recently explained,

> The reasonableness of the DOL's proposed calculation depends in part on the availability of other, more reasonable alternatives to that proposal. The fact that [the employer] cannot identify any reasonable alternative to the DOL's calculation is highly probative of whether the DOL's proposed method is reasonable. And more importantly, to the extent that the DOL's calculation provides only a rough estimate of the back wages owed to [employees], that imprecision is a result of [the employer's] failure to keep accurate and complete records. Courts will not punish employees for their employer's failure to comply with the FLSA's recordkeeping requirements. "Disapproving of an estimated-average approach simply due to lack of complete accuracy would ignore the central tenant [sic] of *Mt. Clemens*—an inaccuracy in damages should not bar recovery for violations of the FLSA or penalize employees for an employer's failure to keep adequate records." *Monroe*, 860 F.3d at 412. Although the calculation adopted by the district court may be imprecise, it is the best method available in light of [the employer's] failure to maintain accurate and complete records.

*Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1065 (6th Cir. 2019).

As recounted above, the Court has found that the Plaintiff has met his burden in this case, and has produced sufficient evidence to show the amount and extent of the work employees performed and for which they were improperly compensated. Defendants have failed to negative the reasonableness of that inference. *Min & Kim II*, 919 F.3d at 365. Thus, the Court directs the Plaintiff in recalculating the damages due for the period from June 25, 2013 and ending in December 2015 to use the average weekly hours estimates set out earlier: **52.5 hours per week for grooms, and 44.25 hours for hot walkers**.

As to the period from January 1, 2016 to "the present," Plaintiff requests back wages and

seeks an order that Defendants produce payroll records covering this time period to enable calculation of any back wages due for this period as well. Since the testimony of the witnesses at trial indicated that the deficient pay practices indicated in this Order continued up until the date of the trial, Plaintiff is entitled to overtime damages continuing through the date of the trial, which ended on May 22, 2019. The Court will order Defendants to produce payroll records covering that time period, after which Plaintiff shall calculate overtime damages according to the instructions (and average hours worked per week) set out above.

#### c) Alleged Errors in Calculation

Because the Court is directing the Plaintiff to recalculate damages in this case, it will not at this time examine Defendants' alleged "facial errors and discrepancies" in the Plaintiff's damages computations. [*See* R. 129-3] Rather, the Plaintiff should examine each of these alleged errors and discrepancies when recalculating the damages in this case, and submit along with the recalculated damages a list of each alleged error and an explanation stating whether the error has been resolved or explaining why there is no error.

### E. Defendants' Motion for Judgment

For the reasons explained above, Defendants' Motion for Judgment pursuant to Fed. R. Civ. P. 52(c) (contained within their Proposed Findings of Fact and Conclusions of Law, as allowed by the Court's order at [R. 119]) will be denied except as to the minimum wage claim (for which it will be granted). Judgment on this claim will be included within the separate judgment which will issue after the resolution of the damages calculations in this case.

### F. Injunction

The final issue which the Court must address is the Plaintiff's request for a prospective injunction. As the district court explained in *Min & Kim I*:

> The issuance of an injunction under the FLSA is within the reasonable discretion of the trial court. The imposition of an injunction is not punitive, nor does it impose a hardship on the employer since it requires him to do what the Act requires anyway—to comply with the law. In determining whether to issue an injunction, the central issue is whether the violations are likely to reoccur. A dependable, bona fide intent to comply, or good faith coupled with extraordinary efforts to prevent recurrence weigh against granting an injunction, while an employer's pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective injunction. Thus, in exercising its discretion, a court should consider: (1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance.

*Min & Kim I*, 2018 WL 500333 at *9 (internal citations and quotation marks omitted). In that case, the court explained that "[g]iven that Defendants' pay practices have been and continue to be non-compliant with the strictures of the FLSA, the Secretary [was] entitled to injunctive relief." *Id*. at * 10.

Here, the Court's previous order found that Defendants' (at that time alleged) violations of the FLSA were not willful, since it took some affirmative action to change some of its employment practices and record-keeping practices after the issuance of an injunction in a separate FLSA case in 2013. [R. 74 at p. 21] However, the Court has found another FLSA violation, establishing a pattern of repeated violations. There is no reason to think that Defendants have changed their compensation and record-keeping practices since the trial. And there is no evidence of "extraordinary efforts to prevent recurrence" of the FLSA violations here, and no particular reason here to credit any assurance on the part of Defendants that they will fully comply going forward. Thus, all three factors weigh in favor of an injunction, which the

Court again notes is neither punitive in nature nor burdensome in practice. The Court will grant the Plaintiff's request for one (except, of course, as to the minimum wage provision, since there is insufficient evidence to support a finding that Defendants are liable on that claim).

## III. CONCLUSION

Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Defendants' **Motion for Judgment** pursuant to Fed. R. Civ. P. 52(c) (contained within their Proposed Findings of Fact and Conclusions of Law) is **GRANTED IN PART**, as to the minimum wage claim, and **DENIED IN PART** as to all other claims.

2. Defendants **SHALL** produce payroll records from January 1, 2016 to May 22, 2019, showing the total compensation that the employees listed on Exhibit B to the Amended Complaint were paid each pay period. These records shall be produced within **30 days**.

3. Within **30 days** of receipt of the new payroll records, Plaintiff **SHALL** file new damages calculations computed in accordance with the method set out in this Order, along with a list of each alleged error and an explanation stating whether the error has been resolved or explaining why there is no error, and a proposed judgment for the recalculated amount of damages.

4. Defendants may file an objection to Plaintiff's new damages calculations within **21 days** of Plaintiff's filing of said calculations, after which the matter will stand submitted to the Court.

5. Defendants, KDE Equine, LLC and Steve Asmussen, their agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice hereof, are permanently enjoined from violating the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, et seq., hereinafter referred to as the Act, in any of the following manners:

a. They shall not, contrary to §§ 7 and 15(a)(2) of the Act, 29 U.S.C. §§ 207 and 215(a)(2), employ any employee who is engaged in commerce or in the production of goods for commerce, or who is employed in an enterprise engaged in commerce or in the production of goods for commerce, for more than 40 hours in a workweek unless such employee is compensated for such hours in excess of 40 at an overtime rate of at least one and one-half times the regular rate at which such employee is employed.

b. They shall not, contrary to §§ 11(c) and 15(a)(5) of the Act, 29 U.S.C. §§ 211(c) and 215(a)(5), fail to make, keep, and preserve adequate and accurate employment records as prescribed by Regulation found at 29 C.F.R. Part 516.

This the 11th day of September, 2020.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF KENTUCKY

Claria Horn Boom

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc: Counsel of record