UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| JULIE A. SU, Secretary of Labor, United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:15-CV-562-CHB |
| v. | ) ) | **MEMORANDUM OPINION** |
| KDE EQUINE, LLC, d/b/a, STEVE ASMUSSEN STABLES and STEVE ASMUSSEN, | ) ) ) ) | **AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiff Julie A. Su, the acting Secretary of Labor, United States Department of Labor ("DOL" or "Department"), [R. 155], and the Motion for Summary Judgment filed by Defendants KDE Equine, LLC d/b/a Steve Asmussen Stables and Steve Asmussen (collectively, "KDE"), [R. 157]. Both motions have been fully briefed and are ripe for review. *See* [R. 156; R. 158; R. 162; R. 163]. For the reasons set forth below, the Court will grant the Department's Motion for Summary Judgment and deny the Defendants' Motion for Summary Judgment.

## I.  BACKGROUND

The Court provided a detailed overview of the facts of this case in its September 11, 2020 Findings of Fact and Conclusions of Law. [R. 130, pp. 3–16]. Given the limited scope of the issues presently before the Court, only a brief summary of the relevant facts is necessary here.

Defendant Asmussen is a professional racehorse trainer, and, with his wife, he owns and manages KDE Equine, "a company that runs horse racing operations." *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 411 (6th Cir. 2022). "KDE is one of the largest thoroughbred racehorse

- 1 -

training and care operations in the United States," and it "operates four locations in three states: Texas, New York, and Kentucky." *Id.* At these various locations, KDE employs between 120–150 employees. *Id.* Among KDE's various employees are "hotwalkers" and "grooms." *Id.*

As this Court previously explained, Asmussen has a "long history with the Department of Labor." [R. 130, p. 2]. Sometime in 2011, the Department began investigating KDE in New York. *See* [R. 155-4, ¶ 1 (undisputed per R. 156, p. 4)]; [R. 121, p. 92:8–13 (Trial Transcript Vol. 1)]; [R. 62-8 Case Summary Report)]. Through that investigation, the Department determined that KDE's hotwalkers and grooms, who were employed in New York, were not paid overtime compensation. *See* [R. 155-4, ¶ 2 (undisputed per R. 156, p. 4)]; [R. 121, pp. 92:17–25, 93:1–6 (Trial Transcript Vol. 1)]; *see generally* [R. 62-8 (Case Summary Report)]. Instead, they were paid a set amount regardless of how many hours they worked. *See, e.g.*, [R. 155-4, ¶ 2 (undisputed per R. 156, p. 4)]; [R. 121, pp. 92:17–25, 93:1–6 (Trial Transcript Vol. 1)]. Specifically, "30 employees were not paid time and one-half their regular rate of pay for working over 40 hours per week. These violations occurred as a result of the employer failing to keep accurate time records and paying salaries to nonexempt employees." [R. 62-8, p. 5]. The employees were also paid extra compensation for performing extra tasks. *See, e.g.*, [R. 155-4, ¶ 2 (undisputed per R. 156, p. 4)]; [R. 121, pp. 92:17–25, 93:1–6 (Trial Transcript Vol. 1)]. As a result, the Department filed suit against KDE in the Eastern District of New York, alleging violations of the Fair Labor Standards Act ("FLSA" or the "Act"). *See generally Solis v. KDE Equine, LLC*, Case No. 2:12-cv-06368-LDW-ARL; *see also* [R. 43-1 (Consent Judgment)].[1]

---

[1] The Consent Judgment was also admitted at trial as a Joint Exhibit. *See* [R. 127 (Exhibit Inventory)].

On October 2 or 3, 2012,[2] near the conclusion of the New York investigation, a wage and hour investigator met with KDE's accountant, Pete Belanto, and one of its managers, Toby Sheets. *See* [R. 155-4, ¶ 3 (undisputed per R. 156, p. 4)]; [R. 62-8, p. 5 (Case Summary Report)]. During that meeting, "[a]ll violations were discussed in detail," and Belanto and Sheets "stated that the reason the violations occurred is that the time records were not correctly kept." *See* [R. 155-4, ¶ 3 (undisputed per R. 156, p. 4)]; [R. 62-8, at 5 (Case Summary Report)]. Belanto and Sheets were also "informed of what they needed to do in order to comply with the FLSA going forward," and they were provided with and discussed Wage and Hour Division publications on FLSA compliance. *See* [R. 155-4, ¶ 4 (undisputed per R. 156, p. 4)]; [R. 62-8, pp. 5–6 (Case Summary Report)]. Specifically, Belanto and Sheets were informed that, to comply in the future, KDE must (1) "[p]ay all non-exempt employees at least the minimum wage"; (2) "[p]ay all non-exempt employees at least [time and one half] for hours worked in excess of forty [hours] in a workweek"; (3) "[k]eep and maintain records" as required by the Act; and (4) comply with the applicable regulations. [R. 62-8, p. 5 (Case Summary Report)]. KDE "agreed to fully comply in the future with all applicable provisions of the FLSA." *Id.* They were also given a copy of the Act. *See* [R. 155-4, ¶ 4 (undisputed per R. 156, p. 4)]; [R. 62-8, p. 6 (Case Summary Report)].

On December 10, 2012, KDE consented to the entry of a permanent injunction that required KDE to comply with the FLSA's minimum wage, overtime wage, and recordkeeping requirements in the future. *See* [R. 155-4, ¶ 5 (undisputed per R. 156, p. 4)]; [R. 43-1 (Consent Judgment)]. Shortly thereafter, on January 24, 2013, the United States District Court for the

---

[2] The New York Investigation's Case Summary Report indicates that the meeting took place on October 3, 2012, [R. 62-8, p. 5], while the Department's Statement of Undisputed Material Facts states that the meeting took place on October 2, 2012. [R. 155-4, ¶ 3]. Regardless, the exact date of the meeting is immaterial to the Court's analysis.

Eastern District of New York entered the parties' proposed Consent Judgment. *See* [R. 155-4, ¶ 6 (undisputed per R. 156, p. 4)]; [R. 43-1 (Consent Judgment)]. That order permanently enjoined KDE from violating certain provisions of the FLSA, including its minimum wage, overtime, and record keeping requirements. [R. 43-1, pp. 1–2 (Consent Judgment)]. It also required KDE to pay damages in the amount of $29,095.97, place FLSA posters on display where its employees could view them, and orally inform its employees of their FLSA rights, among other things. *Id.* at 2–5.

While the 2013 Consent Judgment addressed KDE's conduct in New York, the present action arose from its Kentucky operations. In June 2015, the Department initiated this lawsuit, alleging that KDE violated the FLSA while conducting its horse training business at Churchill Downs in Louisville, Kentucky.[3] [R. 1]. An Amended Complaint was filed on January 3, 2017, in which the Department expanded and clarified its original allegations. [R. 43]. Specifically, the Department alleged that, since June 2012, KDE had failed to pay its hot walkers and grooms the federal minimum wage, in violation of 29 U.S.C. § 206; failed to pay those employees appropriate overtime wages, in violation of 29 U.S.C. § 207; and failed to keep adequate and accurate employment records, in violation of 28 U.S.C. § 211. *Id.* at 4–6. The Department sought a permanent injunction enjoining the defendants from violating the FLSA, as well as back wages "for a period of three years prior to the filing date of [the Amended Complaint], and an additional equal amount as liquidated damages. . . until the date [of] compliance with the Act is established." *Id.* at 7–8. Stated another way, the Department sought back wages dating back to 2012, plus liquidated damages and injunctive relief.

---

[3] The Amended Complaint clarifies that KDE's employees worked at Churchill Downs "as well as other location within the state of Kentucky." [R. 43, p. 5].

Both parties eventually moved for summary judgment. *See* [R. 61 (Department's Motion for Partial Summary Judgment)]; [R. 62 (KDE's Motion for Summary Judgment)]. The Department moved for partial summary judgment on its minimum wage and recordkeeping claims, as well as its claim for liquidated damages and the application of a three-year statute of limitations. [R. 61]. KDE, on the other hand, moved for summary judgment on each count in the Amended Complaint. [R. 62].

The Court[4] issued a Memorandum Opinion and Order on March 29, 2018, granting in part and denying in part both motions. [R. 74]. Regarding the overtime and minimum wage claims, the Court denied summary judgment, finding that genuine disputes of material fact existed. *Id.* at 11–20. However, the Court granted the Department's motion to the extent it sought summary judgment on the recordkeeping claims for 2012 and 2013, but denied summary judgment for the recordkeeping claims for 2014, finding that there remained genuine disputes of material fact. *Id.* at 8–11.

The Court also denied the Department's motion to the extent it sought summary judgment on the issue of "willfulness," a finding of which would entitle the Department to liquidated damages and a three-year statute of limitations. *Id.* at 20–21. Regarding the issue of willfulness, the Court found that "[e]ven taking the facts in the light most favorable to the Plaintiff, the record does not indicate that the Defendants' alleged violations were willful." *Id.* at 21. The Court explained,

> KDE has taken affirmative steps to change employment practices and record-keeping to comply with the 2013 injunction. Even if these affirmative actions are not sufficient under certain provisions of the FLSA, such insufficiencies would amount to, at most, mere negligence. The court finds that any FLSA violations by KDE were not willful. As such, the limitations period of this action is two years.

---

[4] At the time, the Honorable Charles R. Simpson III was presiding over this case and issued the March 29, 2018 Memorandum Opinion and Order. [R. 74].

*Id.* As for the liquidated damages issue, the Court found that there existed a genuine dispute of material fact as to whether KDE had acted in good faith (a factor that could weigh against liquidated damages, as explained below). *Id.* at 21–22. As a result, the Court denied summary judgment on that issue. *Id.*

The matter proceeded to a bench trial in May 2019. *See* [R. 115, R. 117, R. 118]. The Court issued its Findings of Fact and Conclusions of Law on September 11, 2020. [R. 130].  The Court found, among other things, that KDE was entitled to judgment on the minimum wage claims. *Id.* at 17. However, it found that the Department had proven its claims for violations of the recordkeeping and overtime provisions of the FLSA related to certain grooms and hot walkers employed by KDE between June 25, 2013 to May 22, 2019. *Id.* at 17–19 (discussing recordkeeping claims); *id.* at 19–34 (discussing overtime claims). The Court granted injunctive relief and ordered KDE to comply with the FLSA. *Id.* at 39–40. The Court also awarded actual damages totaling $211,541.76. *See* [R. 137 (Memorandum Opinion and Order Awarding Damages); R. 138 (Judgment)].

Both parties appealed. The issues before the Sixth Circuit were "(1) whether the district court erred in ruling that KDE's pay plans did not comply with 29 U.S.C. § 207 [regarding overtime wage requirements]; and (2) whether the district court erred in granting summary judgment to KDE on the willfulness and liquidated damages issues." *Walsh*, 56 F.4th at 412. The Sixth Circuit concluded that the district court did not err by granting judgment to the Department on the overtime claims. *Id.* at 412–414. However, the Sixth Circuit held that the district court erred in granting summary judgment on the willfulness issues in favor of KDE "because genuine issues of material fact existed as to whether KDE willfully failed to pay its employees in compliance with the FLSA." *Id.* at 417. "And because liquidated damages are available for

- 6 -

potentially willful violations of the FLSA's provisions," the Sixth Circuit vacated this Court's judgment as to the willfulness issue and the liquidated damages claim and remanded for further proceedings. *Id.*

On remand, this Court held a telephonic status conference to discuss the procedural posture of the case. [R. 154]. The parties advised the Court that they wished to file motions for summary judgment on the willfulness and liquidated damages issues. The parties have now filed their respective motions, [R. 155; R. 157], and those motions are fully briefed and ripe for review. *See* [R. 156; R. 158; R. 162; R. 163]. In their briefing, the parties address three issues: (1) willfulness, (2) actual damages under the three-year statute of limitations, and (3) liquidated damages. *See, e.g.*, [R. 155; R. 157]. In resolving these issues, the Court has the benefit of a full record following the May 2019 bench trial in this case. For the reasons that follow, the Court will grant the Department's Motion for Summary Judgment, [R. 155], and deny the Defendants' Motion for Summary Judgment, [R. 175].

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

- 7 -

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* Moreover "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

When reviewing cross-motions for summary judgment, the Court "must evaluate each motion on its own merits." *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (citations omitted). Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

## III. ANALYSIS

### A. Willfulness

The FLSA provides for a two-year statute of limitations, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), the Supreme Court clarified the appropriate standard for determining whether an FLSA violation was willful. Specifically, the Court held that "[t]o obtain the benefit of the 3-year exception, the Secretary [of Labor] must prove that the employer's conduct was willful as that term is defined in [*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985)]." *Richland Shoe*, 486 U.S. at 135. Under the willfulness standard articulated *Thurston*, the Secretary must show that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Id.* at 131 (quoting *Brock v. Richland Shoe Co.*, 799 F.2d 80, 83 (3d Cir. 1986)); *see also Thurston*, 469 at 128; *Walsh*, 56 F.4th at 414. As the Sixth Circuit explained in *Walsh*, this standard has been satisfied "where the employer 'had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA.'" *Walsh*, 56 F.4th at 414–15 (quoting *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 473–74 (6th Cir. 1999)); *see also Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991).

For example, in *Elliott Travel & Tours*, the employer violated the FLSA's overtime provisions, despite having previously violated those same provisions, paying its employees their unpaid wages, and assuring future compliance with the FLSA's overtime provisions. *Elliott Travel & Tours*, 942 F.2d at 967. As a result, the Department argued that the more recent violations were willful. *Id.* The employer argued that it had acted in good faith and had not been

- 9 -

advised that commissions should be included in gross pay for purposes of commuting overtime pay; however, the Court held that the employer's previous violations, its agreement to pay the unpaid wages, and its promises of future compliance constituted actual notice of its violations, thereby supporting a finding of willfulness. *Id.*; *see also Walsh*, 56 F.4th at 415 (discussing *Elliott Travel & Tours*).

The Sixth Circuit ruled similarly in *Palo Group Foster Home*. In that case, the employer violated the FLSA's compensation provisions. *Palo Grp. Foster Home*, 183 F.3d at 471. The Department had previously found that same employer in violation of those provisions on at least two prior occasions. *Id.* The Sixth Circuit ultimately "held that the undisputed evidence of the employer's prior violations, payment of unpaid compensation, and assurances of future compliance demonstrated that the employer had actual notice of the FLSA requirements." *Walsh*, 56 F.4th at 415 (citing *Palo Grp. Foster Home*, 183 F.3d at 474). This evidence, which was undisputed, was sufficient to show that the employer acted willfully. *Palo Grp. Foster Home*, 183 F.3d at 474; *see also Walsh*, 56 F.4th at 415 (discussing *Palo Grp. Foster Home*).

Thus, the Sixth Circuit has made clear that *Richland Shoe*'s willfulness standard may be satisfied where the employer "(1) had previously been investigated and found in violation of the FLSA, (2) was enjoined by a district court from continuing to violate the statute and ordered to pay unpaid overtime compensation, and (3) made assurances that it would comply in the future." *Walsh*, 56 F.4th at 415; *see also Abadeer v. Tyson Foods, Inc.*, 975 F. Supp. 2d 890, 907 (M.D. Tenn. 2013) ("The Sixth Circuit has made clear that [*Richland Shoe*'s] willfulness standard is met where an employer has actual notice of the FLSA's requirements by virtue of earlier violations, prior agreements to pay unpaid overtime wages, and assurances of future compliance." (citation omitted)). The Sixth Circuit has also clarified that it "do[es] not read

- 10 -

*Elliott Travel & Tours* and *Palo Group Foster Home* as establishing that an employer's violation of the FLSA is per se willful whenever undisputed evidence of these three factual circumstances exists. *Walsh*, 56 F.4th at 415. However, the Sixth Circuit stated in *Walsh* that "[t]he presence of such undisputed evidence . . . does *strongly suggest* that the employer had actual notice of the requirements of the FLSA, upon which a finder of fact could reasonably infer that an employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited.'" *Id.* (emphasis added) In fact, in vacating the Court's ruling on the willfulness issue, the Sixth Circuit noted that "[a]n employer having notice of the FLSA requirements by virtue of prior violations and assurances of future compliance is a material fact that we have found to be *highly indicative* of willfulness." *Id.* at 416 (emphasis added) (citing *Elliott Travel & Tours*, 942 F.2d at 967; *Palo Grp. Foster Home*, 183 F.3d at 474).

In the present case, the Sixth Circuit pointed to certain "arguments and factual assertions" made by the Department "that raise a genuine issue of material fact as to whether KDE willfully violated the FLSA." *Id.* at 416. First, the Department had detailed the earlier New York investigation and the injunction issued by that district court, in which KDE had been required "to comply with the FLSA and pay unpaid overtime compensation," specifically requiring "that KDE comply with the same FLSA provision at issue in this case (i.e., Section 6, Section 7, and Section 11). *Id.* Thus, the Sixth Circuit concluded, the Department had "presented evidence from which a reasonable jury could infer that KDE willfully violated the FLSA because it had actual notice of the requirements of the FLSA by virtue of earlier violations and the injunction." *Id.* (citing *Elliott Travel & Tours*, 942 F.2d at 967).

Next, the Sixth Circuit noted that "KDE's own actions and admissions following the 2013 injunction further support the inference that KDE had actual notice of its FLSA

obligations." *Id.* Specifically, KDE had stated that it made sure its non-exempt employees each received a minimum wage and overtime compensation, as required by the FLSA, and introduced timesheets to comply with their timekeeping and recordkeeping obligations. *Id.* From this, the Sixth Circuit concluded that "[a] reasonable jury could infer that . . . non-exempt employees are to be paid hourly wages and that accurate time records of hours worked by employees must be kept." *Id.*

Lastly, the Sixth Circuit pointed to the Department's assertions that KDE had attempted to conceal its violations and to simulate compliance with the FLSA. *Id.* at 417. For instance, the Department stated that the hours on KDE's 2014 payroll records were calculated by dividing the employee's salary by $8.00, an amount that Belanto, KDE's accountant, believed to be the minimum wage. *Id.* From this, a reasonable factfinder "could infer that KDE knowingly modified its records to portray that its employees were paid by the hour. This could suggest to a juror that KDE was attempting to conceal its failure to pay overtime or to eliminate evidence that might be used against it later." *Id.* On this point, the Sixth Circuit also pointed to Belanto's deposition testimony, in which he stated that timesheets would not arrive until after checks had already been issued, and he typically did not even use the timesheets when filling out paychecks. *Id.*; *see also* [R. 61-8, pp. 93:21–25, 94:1–4 (Belanto Deposition, Vol. 1)]. "A reasonable jury could infer from this record that KDE intended to simulate compliance with the FLSA by maintaining timesheets that were not actually used to issue payroll." *Walsh*, 56 F.4th at 417. Given these various factual circumstances, the Sixth Circuit remanded the willfulness matter back to this Court. *Id.*

The Department now argues that KDE's conduct was willful because (1) KDE was informed in 2012 that the manner in which they paid their employees violated the FLSA, as

evidenced by the proceedings in the Eastern District of New York and the 2013 Consent

Judgment; (2) "KDE did not change the essential features of how employees were paid" even

after the 2013 Consent Judgment; and (3) the changes made by KDE after the 2013 Consent

Judgment "only served to conceal their ongoing lack of compliance." [R. 155-1, p. 4]. KDE, on

the other hand, argues that it cannot have acted willfully where it relied on expert guidance,

specifically, its accountant's expertise on FLSA compliance after entry of the 2013 Consent

Judgment.[5] *See, e.g.*, [R. 156, p. 12[6] ("Because KDE sought and retained an expert to guide and

manager its FLSA compliance, it did not willfully violate the law.")]; [R. 157, p. 13 (same)].

KDE also argues that both state and federal authorities approved of its pay practices. *See, e.g.*,

[R. 157, pp. 8, 13].

Importantly, KDE does not dispute that it had previously been investigated and found to

have violated the FLSA's overtime provisions, that it was enjoined via the 2013 Consent

Judgment from continuing to violate the FLSA, that it agreed to pay the unpaid overtime

compensation in that case, and that it made assurances that it would comply with the FLSA in the

future. *See, e.g.*, [R. 157, p. 3]. Particularly relevant here, KDE does not dispute that, under the

Consent Judgment, it was required to "pay employees at time and one-half their regular hourly

rates for all hours worked over 40 per week" and was further obligated to "make, keep, and

preserve adequate records of their employees and of the wages, hours, and other conditions and

practices of employment maintained by them as prescribed by" the relevant regulations and

provisions of the FLSA. [R. 43-1, p. 2].  KDE does not dispute that it "had actual notice of the

---

[5] KDE also argues that the Department advocates for a per se rule that the three factual circumstances outlined in *Walsh* mandate a finding of willfulness. *See, e.g.*, [R. 156, p. 8]. The Department has made no such argument for a per se rule and instead argues that the factual circumstances of this case—the same factual circumstances cited in *Walsh*—support a finding of willfulness. *See* [R. 158, p. 3].

[6] To the extent the page numbers listed on the bottom of a page conflict with the page number assigned by the Court's electronic docketing system, the Court cites to the page number assigned by the docketing system.

requirements of the FLSA by virtue of" its earlier violations and its promises under the 2013 Consent Judgment. *See Walsh*, 56 F.4th at 414–15 (quoting *Palo Grp. Foster Home, Inc.*, 183 F.3d at 473–74) (internal quotation marks omitted); *see also* [R. 62-8, p. 5]. As noted above, such factual circumstances are "highly indicative of willfulness." *Walsh*, 56 F.4th at 415 (citations omitted). And the Sixth Circuit has repeatedly found that such factual circumstances warrant a finding of willfulness. *See id.*; *Elliott Travel & Tours*, 942 F.2d at 967; *Palo Grp. Foster Home*, 183 F.3d at 474. District courts have followed suit, finding summary judgment to be appropriate in light of similar undisputed facts. *See, e.g.*, *Tyson Foods, Inc.*, 975 F. Supp. 2d at 907 ("The willfulness determination may be made on summary judgment." (citation omitted)); *see also Palo Grp. Foster Home*, 183 F.3d at 472 (affirming district court's finding of willfulness at summary judgment stage).

Moreover, in this case, the undisputed facts also demonstrate that KDE had actual notice of its FLSA obligations after meeting with a wage and hour investigator in October 2012. *See* [R. 155-4, ¶ 3 (undisputed per R. 156, p. 4)]; [R. 62-8, p. 5 (Case Summary Report)]. During that meeting, the investigator discussed all violations in detail and both Belanto, the accountant, and Sheets, a manager, acknowledged that the violations had occurred due to the time records being poorly kept. *See* [R. 155-4, ¶ 3 (undisputed per R. 156, p. 4)]; [R. 62-8, at 5 (Case Summary Report)]. Specifically, the investigator advised that at least thirty KDE employees "were not paid time and one-half their regular rate of pay for working over 40 hours per week," in violation of the FLSA's overtime provisions. [R. 62-8, p. 5 (Case Summary Report)]. The investigator specifically informed KDE that "[t]hese violations occurred as the result of the employer failing to keep accurate time records and paying salaries to non exempt employees." *Id.*

The investigator also informed Belanto and Sheets of "what they needed to do in order to comply with the FLSA going forward," and they were provided with and discussed Wage and Hour Division publications on FLSA compliance. *See* [R. 155-4, ¶ 4 (undisputed per R. 156, p. 4)]; [R. 62-8, pp. 5–6 (Case Summary Report)]. As discussed above, the investigator included detailed instructions on how to comply in the future, including (1) "[paying] all non-exempt employees at least the minimum wage"; (2) "[paying] all non-exempt employees at least [time and one half] for hours worked in excess of forty [hours] in a workweek"; (3) "[keeping] and maintain[ing] records" as required by the Act; and (4) comply[ing] with the applicable regulations. [R. 62-8, p. 5 (Case Summary Report)]. KDE "agreed to fully comply in the future will all applicable provisions of the FLSA." *Id.* KDE does not dispute any of these facts, all of which indicate that KDE had actual notice of its violations and its obligations moving forward. Again, KDE does not dispute that it had actual notice of the FLSA requirements.

The factual record also supports the Department's argument that KDE's payment practices largely remained the same after the 2013 Consent Judgment, and the few changes made by KDE after entry of that judgment "only served to conceal their ongoing lack of compliance." [R. 155-1, p. 4]; *see also id.* at 6. Despite receiving actual notice of its prior violations and its ongoing obligations via that Consent Judgment, KDE did not substantively change its payroll practices. *See, e.g.*, [R. 61-8, pp. 43:10–25, 44:1 (Belanto Deposition, Vol. 1)]; [R. 61-22, p. 53:3–12 (Blasi Deposition)]. Instead, it continued to commit the same violations, including failing to pay time and one-half to its employees for hours worked in excess of forty hours a week due to its failure to keep accurate time records, and paying non-exempt employees based on a "set schedule" (essentially, a salary) even though their hours fluctuated. *See* [R. 130, pp. 3–

- 15 -

16 (Findings of Fact and Conclusions of Law, detailing KDE's pay practices in Kentucky)]; [R 62-8, pp. 5–6 (Case Summary Report, detailing KDE's violations in New York)].

Moreover, while KDE implemented timesheets after the 2013 Consent Judgment, the mere implementation of that practice does not inoculate KDE. Those timesheets were so horribly inaccurate that they were "essentially useless for payroll records." [R. 130, p. 19]; *see also id.* at 5–6 (discussing various issues with the timesheets and noting that "it is abundantly clear that the timesheets were highly inaccurate to the point of being almost unusable"). Numerous defense witnesses testified to this, and even Belanto admitted that he largely ignored the timesheets when calculating payroll. *See, e.g.*, [R. 61-8, pp. 93:21–25, 94:1–4 (Belanto Deposition, Vol. 1)]. The only other time records that could have been used to calculate an employee's regular and overtime hours were "time notes" kept by the foremen and one assistant trainer, and only three pages of these notes were submitted at trial for the entire two-year time frame at issue. *Id.* at 6–7, 19. But those documents, which were general and undated, were insufficient to count as records tracking actual hours worked. *See, e.g.*, *id.*; [R. 74, p. 10]. The Court thus found that the timesheets were too inaccurate and the time notes too general and too few, rendering it impossible to properly calculate the overtime due to an employee. *See* [R. 130, pp. 33–34 (discussing flexible work weeks method)]. In fact, the Court previously found that Belanto, who was located in California, would "prepare[] the payroll before he even received a full set of timesheets or time notes," and he only occasionally used the timesheets to process payroll. *Id.* at 7. KDE does not dispute these facts. As the Sixth Circuit explained in *Walsh*, such facts support a finding that "KDE intended to simulate compliance with the FLSA by maintaining timesheets that were not actually used to issue payroll." *Walsh*, 56 F.4th at 417. Moreover, despite lacking any adequate records or timesheets from which to determine an employee's hours, the payroll

records indicate that employees were being compensated for both "hourly" and "overtime" hours,[7] further suggesting that KDE crafted its payroll records to simulate compliance with the FLSA. Simulating compliance, or in other words, concealing its failure to properly pay overtime, "would suggest KDE knew that its practices were prohibited by the FLSA." *Id.* at 417.

Nevertheless, KDE points to several other facts that it claims are material to the willfulness issue. *See* [R. 156, pp. 5–7]. For example, KDE notes that many of its employees "have difficulty or cannot read, write, speak or communicate in English," and some employees "cannot sign or write their own name," leading these employees to incorrectly complete their time sheets. *Id.* at 5–6.  To address these recurring problems, KDE asked Belanto "to take over their payroll and compliance issues." *Id.* at 6. Belanto, in turn, "devised a set schedule pay method," which Belanto allegedly discussed with the Department. *Id.* KDE also claims that "[i]nternal [Department of Labor] paperwork recorded that KDE was compliant following the 2012 settlement," and the Department approved of KDE's pay practices after visiting KDE's New York premises. *Id.* As a result, KDE alleges, it believed it was compliant with the FLSA and thus implemented the same payroll and recordkeeping practices in Kentucky. *Id.* at 7. KDE also alleges that the New York Labor Department visited its New York grounds in 2015 and found it to be largely compliant with state labor laws. *Id.* Lastly, KDE alleges that it "knew the hours the workers worked." *Id.*

Relying on these assertions, KDE argues that it "reasonably believed—that with its expert accountant overseeing its FLSA compliance efforts, coupled with the positive feedback from the [federal Department of Labor] and New York State [Department of Labor]—that it was FLSA compliant." [R. 156, p. 12]. In other words, KDE argues that it cannot have acted willfully

---

[7] The payroll records were submitted as Joint Exhibit 19 at trial. [R. 127 (Exhibit Inventory)].

because it reasonably relied on (1) its accountant's guidance and (2) the federal and state labor authorities' post-injunction approval of its payroll and recordkeeping methods.

The Supreme Court briefly considered the effect of an employer's reasonableness in *Richland Shoe*. It explained,

> If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful under . . . the standard we set forth. If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should not be so considered under *Thurston* or the identical standard we approve today.

*Richland Shoe*, 486 U.S. at 135, n.13. In other words, to demonstrate willfulness, "[i]t is not enough to show that the employer knew that the [law] was 'in the picture' or that the employer 'acted without a reasonable basis for believing that it was complying with the statute." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 423 (6th Cir. 1999) (quoting *Richland Shoe*, 486 U.S. at 132–34); *see also Koehler v. PepsiAmericas, Inc.*, 268 F.App'x 396, 403 (6th Cir. 2008) (discussing interpretations of "willfulness" in various contexts).

With this standard in mind, the Court considers whether KDE acted reasonably (or perhaps unreasonably but not recklessly) in relying on Belanto's guidance and the Department's alleged approval of its pay practices. First, the Court addresses KDE's assertion that "relying on expert guidance negates willfulness." *Id.* (citing *Hoffman v. Prof'l Med. Team*, 394 F.3d 414, 418–20 (6th Cir. 2005)). None of the cases cited by KDE support such a broad categorical rule. Nevertheless, the Court acknowledges that, in some cases, courts have found an employer's close consultation with an attorney and other authorities as evidence of a lack of willfulness. *See Hoffman*, 394 F.3d 414 (discussing *Thurston*, 469 U.S. at 129 and *Riech v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1080 (1st Cir. 1995)).

KDE relies heavily on one such case, *Newspapers of New England*. *See* [R. 156, pp. 15–16]. In that case, the Department had argued that the employers' violations were willful because there had been an earlier investigation, during which the Department had explained the various overtime and recordkeeping provisions to the employer. *Newspapers of New England*, 44 F.3d at 1080. The Department also noted that the employer paid its employees for reported overtime, thereby demonstrating an awareness of the overtime requirements, but it also instructed employees not to report more than forty hours a week on their timecards, and it sometimes reprimanded employees who did so. *Id.* In its defense, the employer had argued that it paid all reported overtime, which illustrated its attempts to comply with the law in the face of an outdated rule about journalism employees, and it had never instructed its employees to alter their timecards. *Id.* Additionally, some employees testified that they would work unreported overtime in an effort to produce high quality work. *Id.* After a bench trial, the district court found that the employer had violated the FLSA's overtime provisions, but that those violations had not been committed willfully. *Id.* at 1068. On appeal, the First Circuit found that "both parties bulwarked their respective positions with tenable arguments," and as a result, it could not find the district court's decision to be clearly erroneous. *Id.* at 1080.

To be clear, then, the First Circuit did not "[find] that the employer had reasonably tried to follow [Department of Labor] guidance and it never instructed its employees to falsify records in order to underpay them," as KDE states in its briefing. *See* [R. 156, p. 16]. It merely found that the parties had each presented "tenable arguments" to support their positions and thus, the district court was not clearly erroneous in accepting the employer's position. *Newspapers of New England*, 44 F.3d at 1080. Regardless, the Court acknowledges that, in some cases, an

employer's consultation with an attorney or other authority can support its argument that it acted reasonably in attempting to determine its legal obligations. *See Hoffman*, 394 F.3d 414.

On the other hand, courts "have found willfulness most frequently in situations in which the employer deliberately chose to avoid researching the law's terms or affirmatively evaded them." *Id.* (citing *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003)). The factual record in this case more strongly resembles this latter category of cases. Stated another way, the factual record in this case does not support KDE's position that it incorrectly assumed that the pay plan developed by Belanto complied with the FLSA. *See, e.g.*, [R. 157, p. 13].

On this point, KDE argues that, in order "[t]o address KDE's FLSA compliance issues, Belanto devised a pre-determined work schedule and pay method and recordkeeping plan." [R. 157, p. 8]. However, the record indicates that, despite actual notice (via the New York investigation and the resulting Consent Judgment) that its pay practices violated the FLSA, KDE did *not* change the substance of its payroll practices, other than  calling it a "pre-determined work schedule" and implementing timesheets, as discussed above. As the record clearly demonstrates, the employees' hours varied and the timesheets were inaccurate and largely useless for payroll purposes. *See* [R. 130, pp. 3–16]. Consequently, Belanto simply estimated hours based on a pre-determined work schedule and calculated payroll without the use of the timesheets or any other accurate records. Numerous defense witnesses testified to this, and even Belanto admitted that he largely ignored the timesheets when calculating payroll. *See, e.g.*, [R. 61-8, p. 94:1–4 (Belanto Deposition, Vol. 1)]; [R. 130, pp. 5–7 (summarizing various witnesses' testimony about the inaccuracy and unreliability of the time records), 8–16 (discussing the varied hours worked by both hotwalkers and grooms)]. And, as previously noted, Belanto, who was located in California, would often send out payroll before the timesheets even

- 20 -

arrived at his office. *Id.* at 93:21–25, 94:1.  The Court detailed this practice in its Findings of Fact and Conclusion of Law, *see, e.g.*, [R. 130, pp. 5–7, 14–15, 19], and KDE does not dispute these facts.

Given this practice of collecting but largely ignoring the timesheets and instead estimating hours without accurate records—a practice which clearly violates the FLSA, as evidenced by the New York case[8]—no reasonable juror could believe KDE's contention that it incorrectly assumed that Belanto's pay plan complied with the FLSA. *See, e.g.*, [R. 157, p. 13 (arguing that it reasonably believed that this pay plan complied with the FLSA)]. This is especially true in light of the fact that Belanto began working for KDE in 2004 doing payroll, *see* [R. 61-8, pp. 15:4–11, 37:7–8 (Belanto Deposition, Vol. 1)], meaning Belanto was in charge of payroll when the infractions that ultimately resulted in the 2013 Consent Judgment occurred, thereby putting both KDE and Belanto on notice that those very practices violated the FLSA. Despite being put on notice of those infractions, neither KDE nor Belanto made any real efforts to comply with the FLSA, instead implementing a system of completely inaccurate and useless time records and one again failing to pay wages based on actual hours worked. *See* [R. 130, pp. 3–8 (describing the general compensation structure for hotwalkers and grooms)]. Simply put, then, there is no way KDE could have reasonably relied on Belanto's pay plan and advice when KDE and Belanto himself were all perfectly aware that the timesheets were useless and the employees were still not being paid based on actual hours worked. At best, Belanto's pay plan was nothing more than a facade of compliance.

---

[8] During the October 2012 meeting with the wage and hour investigator, Belanto and Sheets acknowledged "that the reason the violations occurred is that the time records were not correctly kept." *See* [R. 155-4, ¶ 3 (undisputed per R. 156, p. 4)]; [R. 62-8, at 5 (Case Summary Report)].

The Court next considers KDE's assertions that counsel, the United States Department of Labor, and the New York Labor Department approved of its post-injunction pay practices. To support this position, KDE first states that Belanto had a conversation about compliance with an attorney named Maggie Moss. [R. 157, p. 8]. However, Belanto only testified that he "had a conversation" about the 2013 Consent Decree; KDE does not cite to any other evidence of record about this conversation or any advice or approval given by Ms. Moss. *See* [R. 129-4, pp. 643:24–25, 644:12]. Accordingly, to the extent KDE is arguing that its pay practices were approved by an attorney, it has failed to cite to any evidence of record to support that position. In any event, for the same reasons articulated above with respect to Belanto, there was no reasonable reliance on this record.

Next, KDE alleges that the Department visited KDE's New York operations and approved of its pay practices, and the New York Labor Department visited KDE's New York premises in 2014 and "found it compliant, but for some missing state-law-required notices." [R. 157, p. 4, ¶ 9]. Again, there is little, if any, information in the record about the substance of these decisions or of KDE's pay practices in New York. The only relevant documentary evidence in the record is a letter from New York State Department of Labor, which includes a $2,085.03 fine for violations of state labor laws. [R. 67-20 (June 26, 2015 Letter)]. As to whether the Department told KDE or Asmussen that they were in compliance with the Act, the Court, as the finder of fact and having reviewed the record, can find no evidence to support this claim (other than Asmussen's vague testimony). In fact, after Asmussen testified, the Department called its lead investigator from the New York case to testify as a rebuttal witness. *See* [R. 125, pp. 107–120 (Testimony of Elaine Guzzo)]. The investigator, Ms. Elaine Guzzo, made clear that she *never* told KDE or Asmussen that they were in compliance. *Id.* at 110:12–19. In doing so,

she discussed a notation that she made in an internal Department computer program, something that the Defendants had cited to at trial as demonstrating Department approval. *Id.* at 110:20–25, 111:1–19, 112:1–5.  Ms. Guzzo explained that her notation did *not* state that she found KDE and Asmussen to be in full compliance with the FLSA; rather, she "found them to be *agreeing to be* compliance based on the fact that they were signing the consent judgment." *Id.* at 110:16–19 (emphasis added); *see also id.* at 111:13–18.  This Court, as the finder of fact at trial, found Ms. Guzzo's testimony on this point to be highly credible.

Thus, it is clear to this Court, the finder of fact at the bench trial, that on this record, the Department never told KDE that the practices at issue were compliant with the Act. Moreover, even if it were true that these authorities approved KDE's pay practices shortly after the 2013 Consent Decree was issued, it is apparent from the record that those practices eventually devolved to the point that Belanto began calculating hours and overtime wages without the use of timesheets or any other accurate records, at least as far as KDE's Kentucky operations are concerned. KDE does not cite to any evidence of record suggesting that a credible authority approved of such practices.

Lastly, the Court addresses KDE's argument that its employees' illiteracy created recurring problems with the timesheets. *See, e.g.* [R. 157, pp. 3, 9–10]. At trial, Asmussen testified that some employees were unable to read, write, or fill out timesheets, and some employees relied on others to record their time. [R. 130, p. 14]. Numerous defense witnesses so testified. *See* [R. 162, pp. 3–4]. The Department does not now dispute these facts, but instead disputes the materiality of these facts, *id.* at 3, and argues that the employee's literacy issues are no excuse for failing to keep adequate records. *See id.* at 12–13. After all, the Department argues, KDE knew after the Consent Judgment was entered that its employees were not keeping accurate

timesheets, and it knew that it was required by law to do so, but it nevertheless failed to remedy this problem. *Id.* at 12. KDE, on the other hand, appears to argue that these facts are material because, when "[c]onfronted with the many problems associated with accurate and timely payroll and required recordkeeping, Defendants asked Belanto, their accountant, to take over their payroll and compliance issues." [R. 157, p. 9]. Besides failing to cite to any evidence or testimony to support this assertion, KDE also fails to explain how its employees' illiteracy negated its own responsibilities under the FLSA or in any way justified its poor recordkeeping and wage violations. As noted above, Belanto was well aware of KDE's prior FLSA violations, its obligations under the Act, and the 2013 Consent Judgment, yet he consistently completed payroll and issued paychecks before he even received the timesheets, inaccurate or not. [R. 61-8, pp. 93:21–25, 94:1–4 (Belanto Deposition, Vol. 1)]; *see also* [R. 62-5 (Consent Judgment, detailing KDE's obligations under the FLSA and its promises to comply with the Act in the future); [R. 62-8 (Case Summary Report, similarly detailing KDE's violations of the FLSA, actions required to come into compliance, and KDE's promise "to fully comply in the future with all applicable provisions of the FLSA")]. To the extent KDE argues that Belanto was justified in doing so given the employees' illiteracy, or that the employees' reading and writing issues somehow negate KDE's willfulness, the Court finds this argument to be meritless and unsupported by the law.

The undisputed facts of this case demonstrate that KDE "(1) had previously been investigated and found in violation of the FLSA, (2) was enjoined by a district court from continuing to violate the statute and ordered to pay unpaid overtime compensation, and (3) made assurances that it would comply in the future." *Walsh*, 56 F.4th at 41. Given these undisputed facts, and the detailed conversation between a Department investigator and Belanto and Sheets,

in which the parties discussed prior violations and instructions for future compliance, the Court finds that KDE had actual notice of its obligations under the FLSA. Again, KDE does not dispute this fact.

The undisputed facts also indicate that KDE continued to violate the FLSA, despite having been advised of the same violations by the Department during the course of the New York investigation, despite having been enjoined by a federal court from further violating the FLSA, and despite promising to comply with the FLSA. *See generally* [R. 130 (Findings of Fact and Conclusions of Law, finding violations of the recordkeeping and overtime provisions)]. In other words, in the face of actual notice of its prior violations and its ongoing obligations under the FLSA, KDE continued to violate the Act. Under similar factual circumstances, courts have awarded summary judgment in favor of the Department on the issue of willfulness. *See, e.g.*, *Palo Grp. Foster Home*, 183 F.3d at 474; *Tyson Foods, Inc.*, 975 F. Supp. 2d at 907.

Other undisputed facts in this case set it apart even from cases like *Palo Group Foster Home* and *Elliott Travel &Tours* and also support a finding of willfulness. For example, when KDE's employees routinely failed to properly complete their timesheets, KDE continued to issue paychecks, without reference to the timesheets or any other accurate records. *See, e.g.*, [R. 61-8, pp. 93:21–25, 94:1–4 (Belanto Deposition, Vol. 1)]. Yet, it continued to collect these improperly completed and largely useless timesheets. This suggests that KDE collected the timesheets to create an image of compliance, while it continued its practice of estimating hours and overtime wages without accurate records. *See Walsh*, 56 F.4th at 417 ("A reasonable jury could infer from this record that KDE intended to simulate compliance with the FLSA by maintaining timesheets that were not actually used to issue payroll."). These facts further support a finding of willfulness.

To the extent that KDE has attempted to negate these facts or otherwise raise a genuine dispute of material fact by citing to its reliance on Belanto and the alleged approval of state or federal labor authorities, the Court has already found that those arguments fail. A reasonable jury could not find that KDE acted reasonably (or even unreasonably but not recklessly) based on the evidence of record. Stated another way, based on the undisputed material facts, no reasonable fact finder could find for KDE on the issue of willfulness, and summary judgment in favor of the Department is therefore appropriate. Accordingly, the Court will grant the Department's motion and deny KDE's motion to the extent the parties seek summary judgment on the issue of willfulness. Having concluded that KDE acted willfully, the Court must now consider the parties' arguments on damages.

### B. Damages

The Department argues that, if the Court finds that KDE acted willfully, damages should be calculated based on a three-year statute of limitations, thereby entitling it to back wages in the amount of $31,718.37, in addition to the $211,541.75 in back wages previously awarded by the Court. [R. 155-1, pp. 12–13]; *see also* [R. 137 (Memorandum Opinion and Order Awarding Damages)]. The Department also argues that, if the Court finds that KDE acted willfully, it must award liquidated damages in an amount equal to the unliquidated damages. [R. 155-1, pp. 12–13]. The Department therefore requests that judgment be entered in its favor for $486,520.26 ($211,541.76 in previously awarded back damages + $31,718.37 in additional back wages + $243,260.13 in liquidated damages equaling the total amount of back wages). *Id.* at 14. KDE responds that liquidated damages are unavailable when the employer relies on its accountant's advice. *See, e.g.*, [R. 156, pp. 17–19]; [R. 157, pp. 14–15]. KDE also argues that, in the event the

Court awards damages, it should reject the Department's calculations. *See* [R. 156, pp. 19–22]; [R. 157, pp. 16–17].

Before turning to liquidated damages, the Court first considers the appropriate statute of limitations, whether additional back wages should be awarded, and, if so, in what amount.

### 1. Additional Back Wages

As an initial matter, the Court notes that KDE does not dispute that, upon a finding of willfulness, the appropriate look-back period is three years, rather than two. *See* [R. 156, pp. 19–20]; [R. 157, pp. 16–17]. The Court agrees that the appropriate look-back period, or statute of limitations, is three years due to KDE's willful violations of the FLSA, as outlined above. *See* 29 U.S.C. § 255 (explaining that an action under the FLSA "may be commenced within two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued"); *Richland Shoe*, 486 U.S. at 131 (discussing the two-tiered statute of limitations); *Palo Grp. Foster Home*, 183 F.3d at 473–474 (same).

Moreover, KDE does not dispute that, because the look-pack period is extended to three years upon a finding of willfulness, the Department is entitled to additional back wages. *See* [R. 156, pp. 19–20]; [R. 157, pp. 16–17]. Instead, KDE disputes the amount of additional back wages requested by the Department. *See* [R. 156, pp. 19–20]; [R. 156-1 (KDE's Objection to the Department's Damages Calculations)]; [R. 157, pp. 16–17]. The Department requests $31,718.37 in additional back wages. [R. 155-1, pp. 12–13]. KDE, on the other hand, insists that the Department is entitled to no more than $17,349.95. *See, e.g.* [R. 156, p. 20].

In making this argument, KDE does not dispute the dollar amounts listed in the chart attached to the Department's motion. *See, e.g.*, [R. 157, pp. 16–18]; [R. 155-3 (Back Wages

Calculations Chart)]. Rather, KDE argues that the Department may only seek back wages for those employees listed in the Department's post-trial filings. *See* [R. 157, p. 16]; [R. 132-1 (Previous Back Wages Calculation Chart)]. It argues that, under the law-of-the-case doctrine, "only those workers included in this Court's appealed and affirmed judgment are part of this case." [R . 157, p. 16]. The Department has therefore erred, KDE argues, by "includ[ing] workers not listed in the Court's affirmed judgment." *Id.* KDE also argues that the Department's calculations wrongfully include four supervisory employees. *Id.* at 17.

The Court finds no merit in these arguments. First, KDE cites to no authority and seems to rely only on the law-of-the-case doctrine to support its position. But the law-of-the-case doctrine does not preclude the Court from considering additional back wages owed under a three-year look back period, rather than a two-year period, now that it has found, on remand, that KDE acted willfully. *See generally Caldwell v. City of Louisville*, 200 F. App'x 430, 433 (6th Cir. 2006) (discussing application and limitations of the law-of-the-case doctrine). In fact, KDE does not dispute that the Court may award additional back wages upon application of the three-year statute of limitations; instead, it argues that the Court's consideration of that additional third year is limited to only those employees named in its earlier calculations, when it considered only a two-year look back period. KDE cites to no authority to support this position, and the Court finds it to be meritless. *See generally* 29 U.S.C. § 255 (explaining that "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued").

Lastly, the Court notes that KDE previously stipulated that the four alleged supervisory employees "were employed by the Defendants as hot walkers and/or grooms at certain times during the limitations period," and "hot walkers and grooms are non-exempt employees and are

Case 3:15-cv-00562-CHB-RSE   Document 164   Filed 03/04/24   Page 29 of 34 PageID #: 8437

required to be paid overtime compensation." [R. 64, ¶ 2]. At the time that stipulation was filed in

August 2017, the Court had not yet ruled on the willfulness issue and the Department was still

seeking a three-year limitations period. The Department cites to this stipulation in its response,

but KDE fails to address it in its reply. *See* [R. 163]. Additionally, while KDE submits an

affidavit from one of its bookkeepers, in which the bookkeeper states that he is familiar with

KDE's financial records as of March 1, 2019 (after the relevant time period), and that "these four

employees were foreman that are paid a salary," the affidavit does not include any further

information from which this Court could determine that those employees are exempt under the

FLSA during the relevant time period. *See generally* 29 U.S.C. § 213 (discussing exemptions). In

the absence of such information, and in light of KDE's clear stipulation earlier and its failure to

dispute that stipulation, the Court finds that there is no genuine dispute of material fact on this

point. Rather, the record indicates that the four employees at issue were non-exempt hotwalkers

and/or grooms.

Because KDE's challenges to the Department's calculations fail, and KDE does not

otherwise dispute those calculations, the Court will adopt the Department's back wages

calculations and award additional back wages in the amount of $31,718.37. *See* [R. 155-3 (Back

Wages Calculations Chart)]. Added to the Court's earlier award of $211,541.76 in back wages,

*see* [R. 138], the total actual damages award is now $243,260.13 ($211,541.76 + $31,718.37).

Having determined the appropriate look-back period and the additional back wages to be

awarded, the Court next considers liquidated damages.

## 2. Liquidated Damages

The FLSA provides for liquidated damages in an amount equal to the actual, unliquidated

damages. *See* 29 U.S.C. § 216(c) ("The Secretary may bring an action . . . to recover the amount

- 29 -

of unpaid minimum wages and overtime compensation and an equal amount as liquidated damages."); *Acosta v. Min & Kim, Inc.*, 919 F.3d 361, 366 (6th Cir. 2019) ("The Act permits the Department to recover liquidated damages up to the amount of the unpaid overtime—what amounts to a possibility of double damages.").[9] Liquidated damages are "the norm." *Tyson Foods, Inc.*, 975 F. Supp. 2d at 908 (quoting *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004)) (internal quotation marks omitted). As such, a "strong presumption [exists] under the statute in favor of doubling." *Id.* (quoting *Elwell v. Univ. Hospitals Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002)) (internal quotation marks omitted).

However, the FLSA also allows a court, "in its sound discretion," to reduce or eliminate liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. In discussing this "limited affirmative defense," *Palo Grp. Foster Home*, 183 F.3d at 474, the Sixth Circuit has explained that the employer-defendant "has the 'substantial burden' of proving to the satisfaction of the trial court that its acts giving rise to the suit are *both* in good faith *and* reasonable." *Elliott Travel & Tours*, 942 F.2d at 968 (quoting *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990)) (internal quotation marks omitted).

Importantly, however, in the absence of "a good-faith disagreement with the authority of the government to promulgate the statute, a finding of willfulness is dispositive of the liquidated-damages issue." *Palo Grp. Foster Home*, 183 F.3d at 474; *see also Elwell*, 276 F.3d at 840 (explaining that, in the absence of a showing of good faith and reasonableness, "a district court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid

---

[9] Liquidated damages are available only for minimum wage and overtime violations. *See Min & Kim*, 919 F.3d at 367.

wages" (quoting *McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971))). Stated another way, "proof of willfulness precludes a showing of good faith," and as a result, "a finding of willfulness is dispositive of the liquidated-damages issue." *Tyson Foods, Inc.*, 975 F. Supp. 2d at 908 (quoting *Palo Grp. Foster Home*, 183 F.3d at 474). Thus, as the Sixth Circuit has recognized, the issue of liquidated damages is "[c]losely related to the question of willfulness." *Elliott Travel & Tours*, 942 F.2d at 968.

Here, the Court has already determined that KDE acted willfully in violating the FLSA. *See supra* Section III(A). Nevertheless, KDE argues that the Court should decline to award liquidated damages because its actions were in good faith and reasonable. *See, e.g.*, [R. 156, pp. 13–15]. Specifically, KDE argues that "liquidated damages are unavailable when an employer relies on its accountant or lawyer's expertise and guidance about FLSA compliance in post-actual notice cases." [R. 157, p. 10 (citing *Min & Kim*, 919 F.3d at 366–67; *Elwell*, 276 F.3d at 841). In making this argument, KDE relies almost exclusively on the Sixth Circuit's decision in *Min & Kim. See, e.g.*, [R. 156, pp. 13–15]. In that case, the Sixth Circuit affirmed the district court's finding that two restaurant owners had violated the FLSA's overtime and recordkeeping rules, and as a result, they were required to pay damages for the unpaid overtime amounts. *Min & Kim*, 919 F.3d at 366. In other words, the employers were liable for actual damages. The district court had declined to award liquidated damages, however, because it found the restaurant owners had acted in good faith and had reasonable grounds for believe that they were complying with the FLSA. *Id.* at 367. For example, they met frequently with their accountant to discuss the FLSA's requirements. *Id.* at 366–67. The Sixth Circuit affirmed the district court's ruling on liquidated damages, noting that

> [b]y affirmatively seeking to understand the Act's requirements and consulting with and relying on an accountant about the guaranteed wage, as well as the minimum

> wage and overtime laws, [the owners] acted in good faith and had reasonable
> grounds for believing they were in compliance with the Act.

*Id.* at 367.

In considering the *Min & Kim* case, the Court first notes that KDE has too broadly
characterized its holding. As noted above, KDE cites to *Min & Kim* for the proposition that
"liquidated damages are unavailable when an employer relies on its accountant or lawyer's
expertise and guidance about FLSA compliance in post-actual notice cases." [R. 157, p. 10
(citing *Min & Kim*, 919 F.3d at 366–67; *Elwell*, 276 F.3d at 841)].[10] But that case sets forth no
such blanket rule. Instead, the Court simply found that, based on the factual circumstances
present *in that case*, the employers had acted reasonably and in good faith, as demonstrated by
their consultations and FLSA-related discussions with their accountant. *See Min & Kim*, 919
F.3d at 367.

Moreover, this matter is easily distinguishable from *Min & Kim*. In that case, the district
court did not find that the employers had acted willfully, and that issue was not before the Sixth
Circuit on appeal. Because there was no finding of willfulness, the district court retained the
discretion to reduce or eliminate liquidated damages upon a showing of good faith and
reasonableness. *See generally* 29 U.S.C. § 216(c). In this case, however, the Court has found that
KDE acted willfully in violating the FLSA. *See supra* Section III(A). As noted above, the Sixth
Circuit has made clear that such a finding is dispositive on the issue of liquidated damages. *See
Palo Grp. Foster Home*, 183 F.3d at 474; *Elwell*, 276 F.3d at 840, 841 n.5.  Relying on this
binding precedent, district courts within the circuit routinely hold that a finding of willfulness

---

[10] KDE's citation to *Elwell* is equally unpersuasive. There was no finding of willfulness in that case, and the
defendant-employer failed to satisfy its burden of proving good faith and reasonableness. *See Elwell*, 276 F.3d at
840–42. In reaching this conclusion, the Court noted that the defendant-employer had not "suggested that it was
relying on the expertise or opinion of any other person or entity with knowledge of the FLSA regulations." *Id.* at
841.

precludes consideration of good faith or reasonableness. *See Tyson Foods, Inc.*, 975 F. Supp. at 907; *Clark v. Shop24 Global, LLC*, No. 2:12-cv-802, 2015 WL 13022512, at \*2 (S.D. Ohio, Aug. 19, 2015); *Stewart v. CUS Nashville, LLC*, No. 3:11-cv-0342, 2013 WL 4039975, at \*24 (M.D. Tenn. Aug. 8, 2013); *Greene v. Westwood Property Management, LLC*, No. 3:07-0955, 2009 WL 1362271, at \*15 (M.D. Tenn. May 12, 2009); *Cruz v. Toliver*, No. 5:04CV-231-R, 2006 WL 2692744, at \*2 (W.D. Ky. Sept. 15, 2006).

Like those courts, this Court also finds that its ruling on the willfulness issue disposes of the liquidated damages issue. Because the Court finds that KDE acted willfully in violating the FLSA, it lacks the discretion to reduce or eliminate liquidated damages. Even if the Court retained discretion on this issue, its willfulness finding demonstrates that KDE has failed to show good faith. *See supra* Section III(A) (willfulness analysis). The Court therefore finds it appropriate to award liquidated damages in an amount equal to actual damages, pursuant to 28 U.S.C. § 216(c). As noted above, the actual damages now total $243,260.13, and the Court will therefore award liquidated damages of $243,260.13.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant the Department's Motion for Summary Judgment, [R. 155], and will deny KDE's Motion for Summary Judgment, [R. 157]. Specifically, the Court finds that there is no genuine dispute of material fact as to whether KDE acted willfully in violating the FLSA, and given such willful behavior, a three-year statute of limitations applies. As a result, the Court will award additional back wages in the amount of $31,718.37, for a total actual damages award of $243,260.13. The Court will then award liquidated damages in an amount equal to the actual damages awarded, pursuant to 29 U.S.C. § 216(c).

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Motion for Summary Judgment filed by Plaintiff Julie A. Su, the acting Secretary of Labor, United States Department of Labor, [**R. 155**], is **GRANTED**.

2. The Motion for Summary Judgment filed by Defendants KDE Equine, LLC d/b/a Steve Asmussen Stables and Steve Asmussen, [**R. 157**], is **DENIED**.

3. The Court **ADOPTS** the damages calculations (totaling $31,718.37) provided by the Department concerning the additional back wages owed under a three-year statute of limitations, [R. 155-3], as the **FINDING OF THE COURT**. This brings the total amount of back wages to $243,260.13 ($211,541.76 + $31,718.37).

4. The Court will award liquidated damages in an amount equal to actual damages, for a total damages award of $486,520.26 ($243,260.13 actual damages + $243,260.13 liquidated damages).

5. A separate judgment shall follow.

This the 4th day of March, 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY